# U. S. CIRCUIT COURT.

## BOSTON, DECEMBER, 1814.

United States
v.               } MURDER.
George Travers.

Present—Hon. *Joseph Story*.

Hon. *John Davis*.

*George Blake*, Esq., District Attorney, Counsel for the United States.

*Benjamin Whitman*, and *Alexander Townsend*, Esqrs. Counsel for the prisoner.

A grant of land by a state to the United States, reserving a concurrent jurisdiction, in executing process within, for offences committed without such tract, the United States have a sole and exclusive jurisdiction of crimes committed *within* the tract.

*U. S. of America, District of Massachusetts, ss.*

At a circuit court of the United States of America, for the first circuit, begun and held at Boston, within and for the said district of Massachusetts, on the 15th day of October, in the year of our Lord, one thousand eight hundred and fourteen.

The object of such a reservation is to prevent the place from becoming an asylum for fugitives from justice.

When the fact of killing is proved, the law presumes it to be founded in malice. All circumstances of justification, excuse or mitigation, are to be proved by the prisoner, lest they arise out of the evidence produced against him.

Where a crime in itself capital, is endeavoured to be committed, with force, it is lawful to repel that force by the death of the party making such attempt. The law will not suffer, with impunity, any crime to be prevented by death, unless the same, if committed, would also be punished by death. Homicide in resisting an arrest, substantially illegal, will, at most, amount only to manslaughter.

Homicide excusable and justifiable. (See page 497.)

A soldier who has enlisted in, and served out his time in the marine corps, but who is refused his discharge, nevertheless, while he remains in the barracks, is subject to the rules of the establishment, and cannot violate them, except as to any act or exertion, the direct object of which should be to depart from the place.

And if engaged in a brawl or quarrel with others, he may be restrained by force, and put under confinement by the officers: and if the officers advancing to him for the purpose of arrest, he fires off a gun, which he had previously in his hand, and which he had loaded, declaring he would kill any person that approached him, and kills a person, it is murder. Even had the gun went off by accident, it would have been manslaughter—the act being unlawful.

The jurors of the United States of America, within and for the said district of Massachusetts, upon their oaths, do present, that George Travers, late of Charlestown, in the county of Middlesex, in the said District of Massachusetts, labourer; not having the fear of God before his eyes, but being moved and seduced by the instigation of the devil, on the 27th day of November, in the year of our Lord one thousand eight hundred and fourteen, with force and arms at Charlestown aforesaid, in the county of Middlesex, in the District of Massachusetts aforesaid, and in a certain place, commonly called the navy yard; situated in Charlestown aforesaid, which said certain place then was, ever since hath been, and yet is a place under the sole and exclusive jurisdiction of the United States of America; in and upon James McKim, in the peace of God, and of the said United States, then and there being, feloniously, wilfully, and of his malice afore-thought, did make an assault; and that the said George Travers, a certain musket of the value of five dollars, then and there loaded and charged with gunpowder, and one leaden bullet; which musket he the said George Travers, in both his hands, then and there had and held to, against, and upon the said James McKim, then and there feloniously, wilfully, and of his malice afore-thought, did shoot and discharge; and that the said George Travers, with the leaden bullet aforesaid, out of the musket then and there by force of the gunpowder, shot, and sent forth as aforesaid, the aforesaid James McKim, near the pit of the stomach of him the said James McKim; and there with the leaden bullet aforesaid, out of the musket aforesaid, by the said George Travers, so as aforesaid, shot, discharged, and sent forth feloniously, wilfully, and of his malice aforethought, did strike, pene-

trate and wound ; giving to the said James McKim, then and there with the leaden bullet aforesaid, so as aforesaid, shot, discharged and sent forth, out of the musket aforesaid, by the said George Travers, in and upon the said breast of him the said James McKim, near the pit of the stomach, of him the said James McKim, one mortal wound, of the depth of eight inches, and of the breadth of half an inch ; of which said mortal wound the aforesaid James McKim then and there instantly died : and so the jurors aforesaid, upon their oaths aforesaid, do say that the said George Travers, the said James McKim then and there in manner and form aforesaid, feloniously, wilfully and of his malice aforethought, did kill and murder, against the peace and dignity of the United States of America, and against the form of the act of Congress of the United States, in such case made and provided,

HENRY HOMES, Foreman.

GEORGE BLAKE, District Attorney.

The facts of the case appeared by the evidence as follows : On the evening of the 27th November, at about an half or three quarters of an hour antecedent to the fatal event, the prisoner, who had been a marine in the service of the United States, but whose term of service had a short time previously expired, was, with several of his comrades, engaged in the sport of casting snow balls at each other, in the Navy Yard at Charlestown. In the course of this recreation, a person by the name of Stocker accused the prisoner of having unfairly concealed a brick-bat in a ball of snow which he had thrown at him. The prisoner denied the charge. A tumult arose—several blows were exchanged between

BOSTON,
Dec. 1814.

U. States
v.
Travers.

the prisoner and Stocker: others of the party were soon involved in the affray, and a considerable conflict ensued. Notice of the affray was soon communicated to the principal officer of the guard. A quarterly sergeant appeared, and ordered the wranglers to desist, and threatened to make known the circumstance to the orderly sergeant. High words and blows were still continued, whereupon the sergeant immediately called at the room where the quarrel was going on, and ordered the principal persons who had been engaged in it to the guard house. Stocker, and a person by the name of Livre, obeyed the order without hesitance; but the prisoner remained behind under a pretext that he wanted to take a blanket and some clothes from his bunk: while the sergeant, with Stocker and Livre, were gone to the guard house, a few paces only from the apartment in which the quarrel had originated, the prisoner was heard to declare, and several times to repeat the declaration, that he would not be taken alive to the guard house; that he would be the death of any man who should attempt to force him thither; and immediately retired to a corner of the room, where a number of unloaded muskets had been left in the racks, and taking from a cartridge box, hanging above, two cartridges, he put one of them into a musket, and propelled it down by striking the breech of the gun forcibly upon the hearth—with the other cartridge, after biting off the end, he deliberately primed the gun, and brandishing it about the room, declared repeatedly that he would kill the first man who should approach him. While the prisoner was in this situation, and within five or six minutes after, Stocker and Livre were sent to the guard house; the orderly sergeant McKim and Hasey, accompanied by sergeant Geary, entered the

room : the prisoner instantly accosted them, directing his musket towards the door by which they entered, and saying, sergeant McKim, stand off; if you approach me I will take your life. Geary, with his sword, parried the gun as it was pointed at him, and it was then directed towards McKim, who, being unarmed, endeavoured to parry it with his hand. At this moment the prisoner, being nearly in contact with the wall behind him, drew back the musket a few inches ; and pushing forward again towards, and within an half foot of McKim's breast, discharged the piece, and thereby instantly destroyed the lives of McKim and Hasey.

The question was, whether this was murder or not.

*Davis, J.* Gentlemen of the jury—The time which has been occupied in this trial has not only given opportunity to have fully presented to you all the facts and principles which have a bearing on the subject upon which you are to decide, but must, also, have had a beneficial tendency to produce that state of mind which it is desirable should be possessed by those who have an agency in the administration of justice.

The evidence, which you have heard, discloses a transaction of a nature to excite great emotion. This ought not to be wholly suppressed, but may require regulation and discipline. Excitement and indifference are both to be avoided. There is a just interest in the melancholy subject, which all should feel; but a correct discharge of your duty requires a mental exercise, attention and discrimination, for which calmness and composure are obviously requisite.

A question has been made, by the learned Counsel for prisoner, as to the jurisdiction of the Court. This is, in its nature, a preliminary question ; for if the court have not jurisdiction of the offence alleged in the indictment, it would be superfluous to proceed in the inquiry relative to the guilt or innocence of the prisoner. The objection rests on the terms of cession, by the Commonwealth to the United States, of the ground occupied for a Navy Yard. The act authorizing the purchase of the tract of land in question, limited the quantity to 65 acres, and preserved a concurrent jurisdiction with the United States—so far as that all civil, and such criminal processes as may issue under the

authority of this Commonwealth against any persons charged with crimes committed without the same tract of land, may be executed therein.     The Government has been called upon to prove a purchase, corresponding to the terms of the consent, on the part of the Commonwealth.     The occupation of the place, by the United States, for many years past, is of public notoriety; but the deeds of conveyance have also been produced; and to remove any uncertainty, as to the quantity of land, you have had the testimony of the Surveyor, Mr. Tufts, who was employed on the occasion, testifies, that the whole quantity purchased by the United States was somewhat less than forty acres.     If the evidence should render this objection untenable, it is farther contended, that the reservation made by the Commonwealth does not leave that sole and exclusive jurisdiction in the place, which the law of Congress, relative to criminal offences, requires, in order to give this court legal cognizance of the offence charged in the indictment.     The object of the condition, annexed to the cession, is obvious.     It was to prevent the place from becoming an asylum for fugitives from justice.     By a late decision in the Supreme Court of Massachusetts, it is determined that officers, proceeding to take the benefit of the provision act under the authority of the United States, and that offences committed in a territory ceded with such reservation, are not punishable by the Courts of the Commonwealth.*     I am satisfied that this Court has jurisdiction upon the alleged offence, and that you should disregard the objection.     This being a mere question of law, it is proper that you should be governed, in relation to it, by the opinion of the Court.     If the direction should be erroneous, any verdict, which you may render, will not be conclusive against the prisoner in regard to this objection.     It may again be brought directly before the court, and sustain a more thorough investigation.

I proceed to the other points presented in the examination and argument.     The testimony of the witnesses has been very distinct and deliberate.     There is little complexity in the story, and the facts are of a nature to be deeply impressed upon the memory.     I shall not undertake to recapitulate the testimony, but shall state the principles by which you are to be guided and governed.     In doing this, there must, necessarily, be occasional reference to what may be considered as proved; but you will recollect, that in respect to the evidence, you are the sole and exclusive judges.

* 8 Mass. Rep. 72.

BOSTON, Dec. 1814.

U. States. v. Travers.

You are first to be satisfied of the fact of killing, and are to inquire, whether the deceased came to his death by the instrumentality of the prisoner. To this point you have the evidence of several of the associates of the accused, and of sergeant Geary, who testify as to the loading of the gun by the prisoner, the manner of its discharge, and the fatal effect. You have, also, the testimony of Dr. Bartlet, who was immediately called, who found McKim lying dead, on the spot where he fell; the body, he says, was perforated, in the direction of the lungs; the wound was, in his opinion, a gunshot wound; and, he has no doubt, was the cause of his death.

Whenever the fact of killing is proved, the law presumes it to be founded in malice, until the contrary appear; and, of course, all circumstances relied on in justification, excuse, or mitigation are to be satisfactorily proved by the prisoner, unless they arise out of the evidence produced against him. It is contended, that there are circumstances of such description in this case. You have heard them urged, and argued, and replied to with much ability. To enable you to form a correct judgment of the transaction, and to determine its proper character, it will be necessary that you should carefully compare the evidence with the rules and principles of law relative to homicide. This may present difficulties, but, it may be presumed, not insurmountable. You are, indeed, in a situation, in which it is most important that you should think and reason with precision.— Popular, or even philosophical ideas on the subject, which the law has not sanctioned, or which are incompatible with its requirements, should not be allowed to prevail. You are to attend to legal language, and to adopt it in a legal sense. This, however, will not be found repugnant to the dictates of a plain understanding, considerably exercised; and our law of homicide, rightly understood, will, I trust, be approved by every intelligent person, as founded on a just survey of the principles of human nature, punishing malignant violence or culpable negligence, and yet reasonably accommodated to cases of necessity, and accident, and various exigencies incident to social intercourse. Of homicide, or the killing of any human creature, there are two grand divisions—that which is felonious, and that which is not felonious.

Homicide, not felonious, is either justifiable or excusable. It is convenient, in considering the subject, to regard this subdivision; though now, the legal result to the party on trial is the same, whether the homicide be justifiable or excusable. In either case he is to be acquitted.

In regard to the higher grades of justifiable homicide, a killing by command, or requirement of law, as in the execution of malefactors, or in advancement of public justice, or in the enforcement of arrests, where the officer is resisted, it is not necessary particularly to remark in this case. The defence is not placed on that ground.

Homicide is also justifiable in self-defence, and is permitted by the law against one who manifestly intends and endeavours with violence or surprise, to commit a known felony on the person, habitation, or property of the party killing. Thus, attempts to commit a robbery, murder, or burglary may be repelled with force; and if, in the conflict, the invaded person should happen to kill the assailant, such killing is justifiable. So also it is in defence of chastity. But it is not every manner of force, though wrongful, which will justify killing. The rule is, that where a crime, in itself capital, is endeavoured to be committed with force, it is lawful to repel that force by the death of the party making such attempt; and that the law will not suffer, with impunity, any crime to be prevented by death, unless the same, if committed, would also be punished with death.

You will compare the evidence with this criterion. From the several witnesses who were present, you learn the declared purpose of the interference by the deceased, accompanied by sergeant Geary. You have it also from sergeant Geary himself. If you should be satisfied that the only object on their part was to quell a broil in the barrack, that no felony was threatened or contemplated, and that the only injury or inconvenience intended, or which could, under the circumstances, be apprehended by the prisoner, was arrest and confinement, then it is certain that the killing for such cause, or to prevent such a consequence, is not, in contemplation of law, justifiable.

Excusable homicide is that which occurs by misadventure, or in self-defence, under particular circumstances, distinguishing it from justifiable homicide from a similar motive.

Homicide by misadventure is, where a person doing a lawful act, without any intention of hurt, unfortunately kills another. The instance often mentioned in our books, that of the head of a hatchet flying off, when a man is at work with it, and killing a bystander, is sufficient to illustrate the principle. Cases of this sort, unfortunately, are not of unfrequent occurrence. Where the act is lawful, and the effect is merely accidental, the party in some measure instrumental of the death, is held excusable, and is rather an object of compassion than of punishment.

BOSTON,        The homicide in self-defence, which is considered, in law, as
Dec. 1814.   excusable, rather than justifiable is, that whereby a man may
             protect himself from an assault, in the course of a sudden casual
United States affray or quarrel,· by killing him who assaults him.     In such
   v.        case the law, however, requires of the party to have quitted the
Travers.     combat before a mortal wound shall have been given, to re-
             treat, as far as he can with safety, and at last, to kill from mere
             urgent necessity, for the preservation of life, or to avoid enor-
             mous bodily harm.

From the essential characteristics of excusable homicide, it
will appear that if you should, as before mentioned, find from
the evidence, that the prisoner could reasonably apprehend,
from the deceased, nothing more than arrest and confinement,
then the killing, under such circumstances, cannot be consid-
ered as excusable homicide.     It cannot be ·excusable by misad-
venture ; for there it is essential that the party killing should
be in the exercise of a lawful act.    It cannot be held excusa-
ble in self defence, because, if such be the evidence, of which
you are the judges, there was, of course, no danger of the pris-
oner's life, or of such enormous bodily harm as would render the
killing excusable.

It is contended for the prisoner, that the discharge of the
musket was accidental.    That there is no evidence, or not suffi-
cient evidence of a voluntary act of the prisoner to effect it; but
that the lock was sprung, either by the blow from sergeant
Geary's cutlass, or from the grasp of the gun by the deceased,
the instant before it was discharged.

In regard to this point, you will consider the evidence, and
settle, in your own minds, the question whether from the whole
conduct of the prisoner, relative to the death of McKim, you
can and must infer that he actually discharged the gun which
he had loaded and levelled with a deadly or dangerous direc-
tion.

Mitchell, to whom the gun belonged, says that the spring
of the lock is a stiff one.    The same remark is made by ser-
geant Geary, who examined the gun in your presence.    You
have also seen the gun stock and grasped, in representation
of what took place on that melancholy evening when Mr. McKim
fell.    If you should think it necessary, you may pursue this
examination farther by an examination of the piece, and on the
whole evidence on this head, will come to a conclusion, as
to the probability of the supposition advanced on the part of
the prisoner.    But I must here observe, that if you should
embrace the explanation, which ·has .been offered for the
prisoner, in this particular, you will then have to consider
its legal applicability.    Such explanation, if admitted, can-

not avail to characterize the case as excusable, by misadventure, unless all the conduct of the prisoner, connected with the supposed accidental act of the discharge of the gun, were lawful. Now, if it was lawful to kill for avoiding or repelling the purposes for which the officers interposed, it would also be unlawful to load the gun, and to wield and point it in a dangerous direction, from which death or some serious mischief would be likely to ensue. If such appear to be the conduct and views of the prisoner on that occasion, he cannot be considered as in the exercise of a lawful act, and though the discharge of the gun in such case be admitted or proved to have been done without the actual drawing of the trigger by the prisoner, still the proceeding could not be referred to the head of homicide by misadventure, on account of the unlawful acts which were concomitant.

Bringing the evidence to the test of these principles, if you do not find the act done by the prisoner justified by the command or permission of law, or excused on account of accident or self preservation, it must, of course, fall under the remaining division of homicide, and he considered as felonious.

Felonious homicide, which is defined to be the killing of any human being, without justification or excuse, is divisible into manslaughter and murder.

Manslaughter is the unlawful killing of another without malice express or implied, and it may be either voluntarily upon a sudden heat, or involuntarily, but in the commission of some unlawful act.

I shall not undertake, on this occasion, to specify the various instances of manslaughter; such as should have no relation to the case on trial, might only tend to perplex and embarrass you in your inquiries. Those grounds of defence, which have been relied on, as bringing the offence within this description of homicide, will be considered. First, it is alleged, that the killing of the deceased, was in resistance of an unlawful arrest. Homicide in resisting an arrest substantially illegal, will, at most, amount only to manslaughter. To judge of the validity of this defence, we must consider the situation of the prisoner, and the circumstances under which he acted.

According to the testimony of Capt. Anderson, the prisoner had been five years a soldier in the marine corps, in the service of the United States. The term of his engagement expired on the 22d of September last, about two months before the transaction for which he is on trial. He had repeatedly applied to his commander for his discharge, but could not obtain it. For a time the reason assigned was, that

BOSTON,
Dec. 1814.

United States
v.
Travers,

3d. felonious.

BOSTON,
Dec. 1814.

United States
v.
Travers.

some necessary document had not been received from Washington. Afterward, and before the unhappy occurrence referred to, that document was received. Still the discharge was delayed. Under these circumstances, the situation of the prisoner seems to have been equivocal, and, in a degree, irritating. Capt. Anderson says, that he considered him as a volunteer waiting for his discharge, entitled to pay and rations ; and that he was occasionally called upon to do duty. I do not recollect whether he was considered as compelled to perform military duty ; but it appears that he was considered liable to military discipline, and had been confined, since his time expired, for some alleged misbehaviour.

From want of sufficient information relative to military questions, I may have some misconceptions on this subject. Captain Anderson observes, that he did not consider the prisoner at liberty to depart from the station, under these circumstances, without leave. But I should apprehend that in this he is not correct. The prisoner might have been exposed to some inconvenience, suspicion, or loss of other employment, if he had departed without the usual certificate ; and this consideration, probably, induced him to remain, though with reluctance. and as appears, with resentment. It is to be regretted, that he met with this embarrassment, and that a soldier, whose term of service was accomplished, should be thus retained in a situation so questionable and tending to create difficulties and disgust. In justice to Capt. Anderson, it is proper to suggest a circumstance, from which it may be inferred, that he was not influenced by any unkind or injurious motive in his proceedings. Though dissatisfied with the prisoner's deportment in several instances, it was his intention, he says, to aid him in an application for a pension, on account of some disabilty incurred in the service. This intention, it appears, he had communicated to the prisoner. Notwithstanding the peculiarity of the prisoner's situation at the Navy Yard, and admitting that his residence there was, in a degree, involuntary, or that he was an injured man, still, while thus remaining, he was subject to certain obligations incident to his situation, and he certainly was not at liberty to commit acts of disorder and violence with impunity. His attempts or efforts to leave the place, if efforts were necessary, must, I think, be allowable. If resisted or opposed in such attempts, and violence, or even death had ensued in consequence, it is not necessary now to say how such an occurrence would have been considered. I would hope that no officer would have the temerity to try the experiment. But you will judge, gentlemen, from the evidence, whether the transactions of the evening, which ter-

minated in the unhappy death of sergeant McKim, had any
reference to such attempt to assert and regain his liberty by the
prisoner, or whether they did not merely relate to a quarrel
or affray, in which he had participated.   The duties of the ser-
geants, and particularly the orderly sergeant, and of this de-
scription was the deceased, have been stated to you.   It will,
I presume, be admitted, certainly it has not been disputed, that
the sergeants might and ought to interpose in the manner and
to the extent which they did, in reference to men belonging to
the corps, upon the occurrence of a violent affray.   Was the
prisoner, as he was then situated, also subject to such interpo-
sition or restraint?   In my opinion he was, while thus remain-
ing in the barracks, subject to the necessary rules of the estab-
lishment for the preservation of peace and order.   He cannot,
though he should be considered as an injured man, violate those
rules, always excepting, as before mentioned, any act or exertion,
the direct object of which should be to depart from the place.
There are offences which no one would say he could commit and
not be subject to restraint, such for instance, as setting to the
magazine, or attempting to excite mutiny among the troops.
The same may be said of a seaman, who may not have received
his pay and discharge according to contract.   He may not be
liable to duty, though continued in the ship, but there are
crimes and disorders essential to be prevented which he could
not commit with impunity, and immediate safety and security
of life and property might require that he should be subjected
to discipline and restraint.   If a mere visiter had been in the
barracks on that evening, with or without permission, and had
been concerned in the affray, he would, in my opinion, have been
liable to be put under guard; and if you should be satisfied,
from the evidence, that the prisoner was, on that evening, en-
gaged in a brawl, quarrel, or affray, it was, in my opinion, the
right and duty of the sergeant to interpose and quell such dis-
orders, and to subject to usual military restraint all who were
concerned in it, including the prisoner.

Your attention is called, by the Attorney for the govern-
ment, to some special reasons for securing the prisoner; from
the circumstances testified relative to the bayonet with which
he armed himself in the affray, and the information communica-
ted by the boy to sergeant Todd, that the prisoner had loaded
a gun.

It is farther urged, that there was an assault on the pris-
oner, referring to the manner of sergeant Geary's approach,
and his striking, with his cutlass, the gun with which the
prisoner was armed, and in the same connexion, your atten-

BOSTON,
Dec. 1814.

United States
v.
Travers.

tion is called to the language used by sergeant Geary to the prisoner.

According to the testimony of John Hassell, who reports the language of the deceased as he approached the prisoner, it would appear to have been sufficiently mild.    Sergeant Geary's expressions were more harsh, and, if words could be of any material import in the case, your attention might properly be employed in deciding what language or mode of address was best suited to the occasion, and whether the manner in which sergeant Geary accosted the prisoner was or was not adapted to make the desired impression and induce his submission.  But the rule of law is, that mere words, though reproachful, are no defence in case of homicide, and will not alone constitute a provocation sufficient to free the party killing from the guilt of murder.

Where a man, in the lawful pursuit of his business, is assaulted, and kills the assailant, it may be manslaughter or justifiable homicide, according to the weapon used in the assault, or the danger to be apprehended; but a rightful application of force, against the party killing, can never be considered as an assault.   If sergeants Geary and McKim might rightfully interfere, under the circumstances proved, to disarm and to restrain the prisoner, then the sudden and forcible stroke, by which sergeant Geary directed the gun from its dangerous aim at his body, cannot be viewed as an assault, but as a necessary operation for his own defence and protection.    Of the legality and propriety of those officers' proceedings, I have already remarked, and shall not enlarge on that subject.

If the gun was discharged by means of the stroke given by sergeant Geary, and in the instant of the change in its direction by force of the blow, the consequent death of sergeant McKim by its discharge, would on such supposition be an involuntary act on the part of the prisoner, but would not change the character of the offence, if the prisoner were in the exercise of an unlawful act.    If the offence would have been murder or manslaughter, supposing sergeant Geary to have been killed, it would be the same in regard to the death of McKim.

The agency of the deceased, in producing the effect, by grasping the gun, or the stroke given by sergeant Geary, can make no difference, provided those officers are to be considered as lawfully employed on that occasion, and the prisoner in the exercise of an unlawful act.    If a man, liable to arrest, should arm himself with a hair spring pistol to resist an officer, having a right to make the arrest, and such officer should

be killed in the attempt, by the discharge of the pistol, at the moment of contact, it would be no defence to say that his access to the fatal instrument had produced his death. And when an involuntary killing happens in consequence of an unlawful act, it will be either murder or manslaughter, according to the nature of the act which occasioned it. If it be in the prosecution of a felonious intent, or if in its consequences it naturally tended to bloodshed, it will be murder, but if no more was intended than a mere civil trespass, it will only amount to manslaughter.

The remaining ground of defence under this head is, that the killing was upon a sudden affray and in heat of blood, and thus reducible to manslaughter.

If upon a sudden quarrel two persons fight, and one of them kills the other, it is manslaughter; and so it is if they should on such occasions go out, by agreement, and fight in a field. There would, on such supposition, be some intervening space between the commencement of the dispute and the actual combat, but the law considers it as one continued act of passion; " And," say the authorities, " pays that regard to human frailty, as not to put a hasty and deliberate act on the same footing with regard to guilt."

It appears by the evidence, that there was, on the evening when Mr. McKim was killed, and just before the occurrence, a quarrel or affray in the room occupied by the prisoner and some of his associates. The circumstances of that affair you will recollect. If a death had ensued on that occasion, from a wound inflicted by one of the combatants on another of them, for instance, with the bayonet seized by the prisoner, it might have furnished a case, which the law, in benignant consideration of human infirmity, would consider as manslaughter. The indulgence which the law extends to cases of this description is founded on the supposition that a state of sudden and violent exasperation is generated in the affray, so as to produce a temporary suspension of reason, and that the transport of passion excludes the presumption of malice. But if you should find, from the evidence, that the affray between the original combatants was at an end, a question will then arise whether the law will extend such benignant consideration of the offence, to a state of passion thus excited, when directed against persons who had no agency in giving the provocation. There are instances of such transfer. Innocent and well disposed persons interposing to quell riots or affrays, may happen to be killed in the attempt. Such killing, though of persons thus laudably employed, may amount to manslaughter, from the heat of passion excited, and from

BOSTON,
Dec. 1814.

United States
v.
Travers.

the party killing not being able to discriminate, but imagining that they came to take part in the affray. But when officers, or those who have a right to interpose to quell riots and affrays, do interpose for that purpose, and their object is declared and known, and they are resisted, and killed in such resistance, it is murder in the persons thus resisting and killing. In regard to the limitations of this indulgence to human infirmity on sudden provocation, time is an important circumstance. Even as relates to the person giving the provocation and the immediate object of resentment, "if there be a sufficient cooling time," to use the language of the books, " for passion to subside, and reason to interpose, and the person so provoked kills the other, this is deliberate revenge, and not heat of blood, and accordingly amounts to murder."

You will consider the evidence, in this case, as to the time which elapsed between the affray and the intervention of the deceased. The Attorney for the Government has called your attention to other circumstances appearing in evidence, manifesting, as it is argued, the assumption of new views by the prisoner, and a deliberate design to accomplish an unlawful and felonious purpose. Such are the loading of the gun, the manner of loading it, and the accompanying declarations and conduct of the prisoner. Whether the killing shall be mitigated to manslaughter will depend on your views of the evidence with reference to the legal doctrines which have been stated. A killing in one continued state of passion arising merely from the excitement in the affray, and without circumstances implying malignity of heart, may be considered as manslaughter. But if it should be your opinion, from the evidence, that there was sufficient time for passion to subside, and for reason to interpose; if the prisoner had, or might, under the circumstances, be reasonably supposed to have sufficient self-possession, notwithstanding the excitement, to know the officers and their object, and the purpose of their interference; and, especially, if he was master of his temper, at the time, so as to adopt and cherish new and improper views and purposes, not immediately connected with, or excited by the previous quarrel, the act of killing, under such circumstances, could not, I conceive, be mitigated to manslaughter, on the ground of sudden heat from the previous affray. What was his actual state of mind, and all the circumstances appearing in evidence on this point, you will consider.

If you should find, from the evidence, that the killing was unlawful, and should not consider it as mitigated to manslaughter, on the grounds suggested in the defence, it will then fol-

low, that the offence is of the description alleged in the indictment, and must be considered as murder. The crime of murder has this essential ingredient to distinguish it from manslaughter, that it arises from the wickedness of the heart, denominated by the law, malice aforethought.

The malice intended by this expression, as has been observed, is not merely spite or malevolence to the deceased in particular, but an evil design in general; the dictate of a wicked, depraved and malignant spirit. It may be malice *expressed*, and be manifested by deliberately formed designs or declarations; or malice *implied*, to be inferred from such circumstances as carry in them the plain indications of an heart regardless of social duty, and fatally bent on mischief.

The doctrines of the law on this, as well as the other branches of homicide, have been read to you. I do not think it necessary for me to detain you with any farther observations.

*Story*, J. Gentlemen of the Jury—It is not without reluctance that I address you. I am so entirely satisfied with the charge of my learned brother, and so entirely subscribe to his doctrines, that nothing farther seems necessary to be said on this melancholy occasion. As, however, the present is a capital trial, and the government and the prisoner have in some sort a right to a full expression of my opinion, and as my brother also wishes it, I will detain you for a short time, while I examine the law and the evidence, which are the proper guides for your decision.

I will in the first place give you a summary of the facts. [Here followed a statement of the material facts.]

Upon the point of jurisdiction, I do not entertain any doubt. It is unnecessary to trouble you with the reasons of this opinion; but you will consider it as our decided opinion, that if the land where this transaction happened, had been duly conveyed to the United States, (of which there is no dispute between the parties) the jurisdiction of this court to try the offence is clear. The offence in the sense of the law was committed in a place "under the sole and exclusive jurisdiction of the United States.

I will now proceed to lay before you a general view of the principles of law, as to the subject of homicide.

Homicide is either justifiable, excusable or felonious.—It is justifiable when the act is done from some unavoidable necessity, or for the advancement of public justice, or for the prevention of some atrocious crime. Such as the execution of a criminal convict, and the killing of a person who attempts to rob, murder or commit some other atrocious felony upon the person or property of another.

It is excusable, when it happens by misadventure, or in self-defence. By misadventure, when in doing a lawful act, a person by accident kills another, having used proper precaution to prevent danger. In self-defence, commonly so called, where upon a sudden affray death ensues from necessity, but the necessity is in some

BOSTON,
Dec. 1814.

U. States
v.
Travers.

measure founded upon the fault of the party who urges it in his excuse.

It is felonious, in legal contemplation, when it amounts to manslaughter or murder.—Manslaughter is the unlawful killing of another, without malice express or implied; and it may be voluntary, as upon a sudden heat of passion, or involuntary, as when it happens by accident in doing acts which are either unlawful in themselves or are attended with want of due care and circumspection to prevent mischief.

When death ensues upon a combat in a sudden quarrel without malice prepense, such act amounts to voluntary manslaughter, being attributed to heat of blood arising from human infirmity. In order to reduce such offence from manslaughter to excusable self-defence, it is incumbent on the party to prove two things.—1. That before a mortal stroke given he had declined any farther combat, and had retreated (if he could) as far as he might with safety.—2. That he then killed his adversary through mere necessity in order to avoid immediate death. And in these two circumstances consists the true criterion between manslaughter and excusable homicide.

Murder, a crime at which nature shudders, consists in the unlawful killing of another with malice aforethought. It is this malice which distinguishes this crime from every other kind of homicide; and it may be express or implied from circumstances.

Malice in legal intendment is not confined to that depraved and deliberate determination, where the mind has brooded over its prey and marked out its vengeance in cool blood, or with wicked cunning. Such as are cases of death produced by poison deliberately administrated, or by midnight and solitary assassination. But the true legal notion of malice extends to all cases of homicide perpetrated under such circumstances of wanton cruelty and implacable revenge as evidently to flow from a wicked, malignant and abandoned heart, or as Sir Michael Foster expresses it, " a heart regardless of social duty and fatally bent on mischief." If, therefore, upon a sudden provocation of a slight nature one beat another in a cruel and unusual manner so that he dies, though he did not intend to kill him, it is murder by express malice. So if upon such a provocation a person inflict with a dangerous weapon a punishment utterly disproportioned to the offence, if death ensue, it is murder. Much more will it be murder if upon such a sudden provocation a party fires a loaded gun at another with intention to kill and actually accomplishes his purpose. And if the provocation was even ever so great, and the party has had time to deliberate and cool, and he afterwards kills his adversary, it will be murder. The true consideration in all these cases is whether the party has at the moment of the death acted under the impulse of passion excited by immediate injuries of a serious nature, or has given himself up to a blind and cruel revenge, regardless of consequences, and bent only on the accomplishment of its own malignant purposes.

Such is the general outline of the various legal grades and distinctions of homicide. It will be necessary, however, to repeat and enlarge upon such of these principles as the facts of the unhappy case before you may require to be more distinctly examined;

and in my subsequent remarks I shall confine myself to such considerations only as are immediately applicable to the defence asserted in behalf of the prisoner.

The counsel for the prisoner contend, that this is a case of justifiable, or excusable homicide, or of manslaughter.

Was it justifiable?—This upon the facts can be asserted only, if the prisoner in defence of his person to prevent a known felony with force against his person, *committed the act.* If therefore Geary or McKim at the time of the affray intended to murder, rob, or do some enormous bodily harm to the prisoner, and he to repel this felonious attempt killed McKim, then it was a strictly justifiable homicide. If no such felony was intended, then it falls under a different consideration.

Was it excusable?—This must be by misadventure or in self defence. Misadventure exists where a man doing a lawful act without any intention of bodily harm, and using proper precaution to prevent danger, unfortunately kills another. Can this definition apply to the prisoner's case?—Had the prisoner no intention to kill? Did he use proper precaution *to avoid any danger to life?* Did he kill McKim by mere accident without fault?

Was this excusable homicide in self defence?—This may happen when upon a sudden combat blows have passed between the parties, and one of them in order to avoid immediate death, or some bodily harm, or acting under an impression, formed upon reasonable grounds, that such was the necessity, kills his adversary. He is supposed to kill his adversary under the impression of an absolute necessity so to do in order to safe his own life; and it differs from *justifiable self defence,* properly so called, in this, that the necessity has in some measure arisen from his own fault. But if the party killing is not in any supposed or real *imminent danger of his own* life, if it was not necessary in order to save his own, that he should take the life of his adversary, then it is not excusable homicide; but it falls under the legal consideration of manslaughter. Apply these principles to the facts before you: At the time of firing the gun, did the prisoner believe that he was in imminent danger of his own life from an assault and injury intended by Geary or Mc-Kim? Did he, acting under such belief, kill McKim from necessity to save his own life? If not, then he cannot protect himself under *the plea of excusable homicide.*

Was this a case of manslaughter? The prisoner's counsel contend that it was not a crime of *a higher grade,* because *it was killing* upon an assault from heat of passion upon a reasonable provocation.

It is clear that no words of reproach, how grievous soever, will excuse a man for killing another. Nor will any trivial provocation which in point of law amounts to an assault, nor even a blow, of course reduce the crime of the party killing to manslaughter. For where the punishment inflicted for a slight transgression of any sort is outrageous in its nature, either in the manner, or in the continuance, and beyond all *proportion* to the offence, it is rather to be considered as the effect of a brutal malignity than of human frailty. It is one of the true symptoms of *what the law denominates malice,* and therefore the crime will amount to murder, notwithstanding

BOSTON,
Dec. 1814.

U. States
v.
Travers.

such provocation. Barbarity will often make malice. This is the language of the most approved authority.

For cases of this sort, much also depends upon the weapon or manner of chastisement; for if it be one which immediately endangers life, as a loaded gun, and it is used with brutal violence upon a slight injury, to produce death, the party will be guilty of murder. But if from all the circumstances, the act may fairly be attributed to an intention not to kill or dangerously to wound, but to chastise, or repel the aggressor, and therefore as not proceeding from a cruel and implacable malice founded on a spirit of revenge, it will amount but to manslaughter.

Farther—There must not only be a reasonable provocation, but the act must be done in the transport of passion and heat of blood. For if there have been an opportunity to cool; if there have been time to pause and deliberate; if other objects have intervened, or if there be evidence of express malice, the crime will be inflamed into the atrocity of murder.

Farther—There must not only be a reasonable provocation, and the act be in the transport of passion and heat of blood, but it must be kindled upon reasonable provocation, or under reasonable circumstances of excuse *as to the party killed.* For if a man have a sudden quarrel, and fight with A. by which his passions are strongly excited, and while his passions are thus excited, he without any supposed or real provocation kill B. who is an utter stranger to the whole affair, and has not interfered in the quarrel, nor been in any way connected therewith, even in the party's own supposition, it will be murder. The law never contemplated that merely because a man had given himself up to a transport of passion upon a real injury, he is therefore at liberty to wreak his vengeance upon innocent persons, who have never offended him. Such conduct is rather a proof of that wicked, depraved and malignant spirit which the law deems malicious; and it cannot be extenuated under the pretence of violent passion. Upon this principle, if upon a sudden affray a stranger interfere to part the combatants, and give reasonable notice that such is his intention, and that he means only to keep the peace, and not to interfere in the quarrel; and in so doing is killed by either of the combatants, it is murder;—but if he so interfere without giving reasonable notice of his intention, and be killed, it cannot be more than manslaughter.

Apply these principles to the facts of the present case. When Geary and McKim came to the barrack where the prisoner was, did they, or either of them unlawfully assault or strike, or attempt to strike him? Did they come in the opinion or the knowledge of the prisoner merely to disarm him of his deadly weapon, to restore peace, and suppress the affray? Was the striking of the gun, held by the prisoner, by Geary, to repel an intended injury to himself, and not to injure the prisoner? Was the object of McKim in seizing the gun, and attempting to seize the prisoner, merely to disarm him, or to inflict a serious injury upon him? Even supposing Geary and McKim acted without justifiable cause, was the punishment inflicted by the prisoner outrageously disproportionate to the offence? These are some of the questions which you must ask yourselves before you can decide upon the correctness of the prisoner's defence on this point.

Was this a case of manslaughter to prevent an unlawful arrest? If a person unlawfully arrest or hold another under restraint, and the latter to get rid of such arrest or restraint, kill his adversary without necessity the crime does not amount to murderr. If the arrest or restraint be under lawful authority, it will be murder. But an unlawful arrest or restraint, which is neither felonious nor dangerous to life, will not justify or excuse the homicide—it will at least be manslaughter.

In this view it will be necessary to consider the prisoner's situation; and how far the interference of Geary and McKim to arrest or restrain him was lawful.

And in my judgment it is very clear that the prisoner was in poin of law entirely discharged from the marine service. His term of enlistment had expired, and he was not compellable farther to do military duty. If, indeed, he had before the expiration of his term of service, committed a military crime, for the purpose of trying such offence, an arrest or restraint might have been justifiable. None such is pretended in this case. If, therefore, he had been restrained of his liberty, or prevented from leaving the navy-yard, the detention wonld have been illegal. He might, by a habeas corpus to this court, have been liberated; and might well have maintained an action for damages. If, under such circumstances, he had attempted to depart from the navy-yard, and had been forcibly prevented, he would have had a right to repel force by force, and if necessary, to have taken the life of his opponent. And if he had been killed in this attempt to recover his liberty, it might under circumstances have been murder in the perpetrator.

But although the prisoner was thus in contemplation of law discharged, yet he might remain, if he and the officers of the garrison pleased. He might remain in expectation of his pay or of a pension, or of a certificate or discharge, which should be a voucher for his good behaviour, and of his having left the garrison without desertion. And if he chose to remain, (however reluctantly), and to perform military service partially, until he could obtain a regular discharge, or receive his pay, although not a soldier, he was undoubtedly liable, in a limited degree, to the regulations necessary to the peace and subordination of a military garrison. And even if he was unlawfully detained, or remained under an erroneous impression that he was bound so to do, this would not authorize him, in collateral things, to violate the laws. For even an unlawful detention will not authorize a man to perpetrate crimes against innocent persons, or on other occasions, disconnected with his attempts to recover his liberty. You will, therefore consider what was the actual situation of the prisoner at the time of this melancholy occurrence. You will judge whether he was a voluntary resident in the barracks, or at least a reluctant submissive subject, or was then under the effect of peaceable physical restraint, which attempted to withhold him from liberty.

But supposing him to be in the most favoured condition, and entitled to all the rights of a stranger; still in a military post or garrison, every person who is voluntarily there either as a visiter or guest is bound to observe peace and order, and to conduct himself inoffensively. If he excite a riot, if he attempt to stab or wound or kill any one within the lines, he is liable to be arrested and detained until he can be placed in the hands of the proper tribunals

REPORTS OF CRIMINAL LAW CASES.

BOSTON,
Dec. 1814.

U. States
v.
Travers.

having jurisdiction to punish him. It is not competent for mere military officers in such case to apply imprisonment by way of punishment; but it is their duty to apply it, if necessary, to prevent bloodshed, and restore peace, and to keep the offender to answer over to a competent tribunal.

Farther—If a party be under a supposed military constraint in a garrison or post, as to all other cases not affected by that restraint, he must be subjected to the rules which are essential to preserve the rights of other persons. It would be subversive of all the principles of justice to allow a man in such a predicament to murder or wound any innocent person, who was in the garrison, and who was in no shape instrumental in his imprisonment. Surely no person could justify such an act; or the blowing up of the magazine, or the burning of the buildings, because he was there against his own wishes.

You will attend to all the circumstances of this case, and apply to them the principles which I have stated. It is admitted on all sides, that it was the duty of Geary and McKim to preserve the peace of the garrison, and to prevent brawls and riots. You have heard the evidence. The prisoner was engaged in a brawl. He had seized a bayonet with an avowed or supposed intention to stab one of his comrades. He had loaded and primed his gun, and declared that he would kill any one that came near him. His comrades were alarmed, and carried information to the orderly sergeant. Under these circumstances, (if the evidence satisfies you of the facts,) it was lawful for Geary and McKim to interfere and suppress the brawl, and disarm the prisoner. He was in a great rage, and threatened violent injuries and outrages, and even death to those about him. It was in the night; and if the guard-house was a proper place of security, of which you will judge, it was lawful for Geary and McKim to arrest him, and carry him thither. They had no right to apply imprisonment as a punishment. But they had a right to secure him from doing farther mischief, and to confine him for a reasonable time, until he could be brought before a competent tribunal. If they intended no more; if they acted reasonably in the discharge of their duty; if the prisoner knew that this was their sole object, then you will consider how far the prisoner can shelter himself under the defence of manslaughter, as upon an unlawful arrest.

Before I quit the subject, I will barely remind you that, if taking all the circumstances together, you are satisfied that the prisoner perpetrated the act from express malice, or a previous deliberate intention to kill, he is guilty of murder, although he did the act upon a reasonable provocation. And the same is the law if the prisoner made the attempted arrest a mere cover to wreak his vengeance on the party who was killed, and acted with deliberate cruelty and malignity in the execution of his previous purpose.

You will weigh all the circumstances with care and tenderness towards the accused. You will allow every reasonable doubt in his favour. But a blind and visionary incredulity which refuses to be satisfied without the highest possible proof of the most minute parts, ought not to be indulged. Your duty to your country and to the prisoner requires you to act with caution, and in giving your verdict, to consult the honest dictates of your consciences.

Prisoner was found guilty of manslaughter.