## 22549. WALKER *v.* THE STATE.

DECIDED MAY 12, 1933.

*Oliver R. Hardin, Ben T. Brock, J. M. C. Townsend,* for plaintiff in error.

*John C. Mitchell, solicitor-general,* contra.

MacINTYRE, J. The indictment in this case charges that Will

Walker committed the crime of murder on September 20, 1932, in Whitfield county, Georgia, by shooting Alf Wilson with a shotgun. The jury found the defendant guilty of voluntary manslaughter, and his exception here is to the judgment overruling his motion for a new trial, based upon the usual general grounds and three special grounds complaining of the court's refusal to give the jury certain timely, written requested charges relating to illegal arrests. As we view the record, the main question for determination is whether or not said requested charges were applicable to the facts of the case. It therefore becomes necessary to set out enough of the evidence and the defendant's statement to indicate whether or not illegal arrest was an issue in the case.

Mrs. Ada Williford and her fourteen-year-old daughter, Dorothy, lived about a quarter of a mile from the residence of H. C. Loner. Walt Haygood, who worked for Loner, visited the Williford home, and Loner, having heard that there had been some sort of a disturbance there, objected to Haygood's visiting there. Loner requested Needham Kennemer to get sheriff J. T. Bryant and see about the Williford place. Some time before the night of the homicide, said sheriff had told Kennemer to look after any disturbance that might occur at Mrs. Williford's. It further appears that Kennemer had information that the "Ringgold man" was at Mrs. Williford's, and that Kennemer went to "get this fellow." It also appears from the record that at about 8:30 o'clock on the night of September 20, 1932, Kennemer and Bert Griffen went to the front door of Mrs. Williford's home, and Lin Wood and Alf Wilson went to the back of the house, and that the defendant shot Wilson, and Wilson died at about nine o'clock the following morning from the gunshot wound inflicted by the defendant. None of the parties in the posse with Kennemer were officers, and there was no warrant for the arrest of Wilson or any one else at Mrs. Williford's place. There was no evidence that there was any sort of disturbance at Mrs. Williford's place on the occasion of the posse's visit there shortly before the homicide. The killing occurred in Whitfield county.

Needham Kennemer testified in part as follows: "I never saw any violation of the law up there myself. All the information I had was purely on what somebody told me, and I don't know whether the disturbance I heard about going on up there was some-

body trying to get in the house, or whether the ladies were participating in some kind of a disturbance there. Bert Griffen and myself and Lin Wood and Alf Wilson were in the crowd that went up there that night. I had a pistol, Bert Griffen had a flashlight, and Lin Wood had a shotgun, and Alf Wilson had a shotgun. At that time I was not any kind of an officer—nothing, only bailiff. I was bailiff when I was in court, and when court was over my pay ceased and my duty ceased. . . I didn't have any kind of a commission. I was not under any kind of a bond. . . We didn't know anybody by the name of Will Walker, and had no warrant of any kind. We were going after the 'Ringgold man.' I don't know that Will Walker was known as the 'Ringgold man' . . . Why sure, I could have obtained a warrant. . . This fellow here, the 'Ringgold man,' was supposed to be in the loft with a shotgun. . . I didn't know whether the 'Ringgold man' was doing any devilment or not up there—only what people were saying, and I meant to get whoever was up there. . . I meant to get him regardless of what it took to get him. . . "

We quote briefly from the testimony of Lin Wood, the only eyewitness to the tragedy: "Me and Alf went to the back of the house, and Kennemer and Griffen went to the front; and when this man started out the back door Wilson said, 'Halt,' and he [defendant] shot him. . . Wilson had not done anything except say, 'Halt.' . . I shot at the other man. . . It was pretty dark . . I won't positively swear that Alf Wilson did not start to shoot at that fellow. . . He had the gun in his hand. . . I don't know whether he raised that gun at Will Walker or not. . . It was so dark out there I couldn't tell. . . He [Wilson] had a gun in front of him. . . I didn't know he [defendant] had a gun until he shot. . . "

Miss Dorothy Williford testified in part as follows: "I first knew somebody was coming up to the house when the dogs went to barking. . . When the dogs began to bark Will Walker taken a gun and went out of doors, . . out the back door, I reckon. The dogs were barking from towards the well. . . After Will Walker went out the back I heard a gun fire. . . After they left there with Mr. Wilson, Mr. Walker came back. . . It seems sort of like he did say that he thought he shot the law. It seems like he said it was the law he shot. . . Will Walker had some hogs he

had raised for my mother. . . There wasn't anybody there in our house misbehaving . . "

The defendant introduced no evidence, but stated to the jury in substance that he was at Mrs. Williford's to see about some hogs that he and she were jointly interested in; that Mrs. Williford told him "about a lot of disturbances going on" and asked him to stay a while; that when he heard the dogs barking he picked up a gun and went out the back way; that suddenly two men appeared, and one of them cried, "Halt," and "come over with his gun that way" (illustrating), and defendant shot; that he could see the gun shining in the skylight, and shot when "he come over with it;" that it was "shoot or get killed;" and that when things "quieted down" he returned to the house and said that somebody had been shot, and that he "hoped it wasn't the law."

Special ground 1 avers that the court erred in not charging the jury as requested in writing as follows: "Every person has the right to resist an illegal arrest, whether attempted by an officer or by a private individual, and, in resistance, may use as much force as is necessary for the purpose, and no more." This is copied from *Holmes* v. *State, 5 Ga. App.* 166 (62 S. E. 716), and is correct as an abstract proposition of law. See *Norton* v. *State,* 137 *Ga.* 842 (3) (74 S. E. 759) ; *Wall* v. *State,* 153 *Ga.* 309, 323 (112 S. E. 142).

It is obvious that the attempted arrest of the defendant was illegal. It is true that the defendant presented by his statement to the jury the defense that he shot under the fears of a reasonable man that a felony was about to be committed upon him, but we do not think that this was his only defense. If the evidence in the case, or the defendant's statement, or both together, presented the defense that the defendant slew Alf Wilson to prevent an illegal arrest, it was the duty of the trial judge, upon a proper and timely written request therefor, to charge the law applicable to that defense. From the defendant's statement it is inferable that he returned to Mrs. Williford's house shortly after the shooting and reported that "somebody had got shot" and he "hoped it wasn't the law." Whether or not the defendant shot in order to protect himself against the illegal arrest that was about to be perpetrated upon him was, in our opinion, a jury question. This being true, the law appertaining to illegal arrests, when requested in writing, should

have been given. The charge of the court omitted entirely the law of illegal arrests, and we hold that the court committed reversible error in failing to give the requested charge.

Special ground 2 avers that the court erred in refusing to charge the jury as requested in writing as follows: "A citizen whom it is attempted unlawfully to arrest has a right to resist force with force proportionate to that being used to arrest him, and if, in the exercise of such right of resistance, he kills an officer or private citizen who joins in an attempt to effect an illegal arrest, who is unlawfully attempting to arrest him, he is guilty of no offense." The foregoing requested charge is very much like the charge referred to in special ground 1. It states correctly a principle of law applicable to the facts of the case, and we hold that the court erred in failing to give it in charge. See cases cited in our discussion of special ground 1.

Special ground 3 complains that the court erred in failing to charge as requested in writing as follows: "I charge you that a private person can not make an arrest unless an offense is committed in his presence or within his immediate knowledge; and if the offense is a felony and the offender is escaping, or attempting to escape, a private person may arrest him upon reasonable and probable grounds of suspicion. But in any event an offense must have been committed by the person sought to be arrested." The first sentence of the foregoing requested charge follows very closely the language of the Penal Code (1910), § 921; and the last sentence appears to be sustained in principle by the following cases: *O'Connor* v. *State,* 64 *Ga.* 125 (37 Am. R. 58) ; *Holliday* v. *Coleman,* 12 *Ga. App.* 779 (78 S. E. 482). It appears that a portion of the requested charge, which has reference to a felony, is not appropriate to the case at bar, for the reason that there is no evidence in the record that the defendant had committed a felony. The last sentence of the charge is the law, and was applicable to the facts of the case.

In conclusion, we will state that we reverse the judgment in this case because of errors pointed out in special grounds 1 and 2. We also deem it proper to state that if upon another trial of this case the facts are similar to those in the present record, the trial judge would do well to shape his charge in accordance with the rules laid down in the cases hereinbefore cited.

*Judgment reversed. Broyles, C. J., and Guerry, J., concur.*