310 Ga. 11
FINAL COPY

S19G1236. GLENN v. THE STATE.

ELLINGTON, Justice.

We granted Christopher Glenn's petition for a writ of certiorari to consider whether the Court of Appeals erred in affirming the trial court's order revoking Glenn's probation based on its determination by a preponderance of the evidence that Glenn committed the felony offense of interference with government property by kicking and damaging the door of a police car when he was detained inside. See *Glenn v. State*, 350 Ga. App. 12 (827 SE2d 698) (2019).[1] Glenn's

---

[1] We note that, in *Glenn*, the Court of Appeals recited that "[o]nly slight evidence is required to authorize revocation" of probation. 350 Ga. App. at 14. The Court subsequently disapproved of this statement of the standard of proof in *Thurmond v. State*, 353 Ga. App. 506, 508 n.2 (838 SE2d 592) (2020) (noting that OCGA § 42-8-34.1, which was adopted in 1988, provides that the standard for proving a probation violation is a preponderance of the evidence and disapproving of *Glenn* to the extent it held that only "slight evidence" of violation of the probation sentence was necessary to justify revocation of probation, as was the law before the Code section was adopted). See *Caldwell v. State*, 327 Ga. App. 471, 472 (758 SE2d 325) (2014) ("Under Georgia law, a trial court may revoke a probated sentence if the evidence produced at the revocation hearing establishes by a preponderance of the evidence the violation or violations of the conditions of probation alleged." (citations and punctuation omitted)).

claim that he damaged the door in the course of exercising his common-law right to resist an unlawful arrest and detention, which was rejected by the trial court and by the Court of Appeals, raises two substantive questions: whether a person has a common-law right to attempt to escape from the detention resulting from an unlawful arrest and, if so, whether a person may damage government property in such an attempt. For the reasons explained below, we hold that the common-law right to resist an unlawful arrest includes the right to use proportionate force against government property to escape an unlawful detention following the arrest. Because the trial court found that Glenn's arrest was unlawful but did not then consider whether the force he used in attempting to escape the ensuing unlawful detention was proportionate, we reverse the Court of Appeals' decision with direction that the case be remanded to the trial court to make this essential determination.

The trial court conducted an evidentiary hearing to determine whether to revoke Glenn's probation for violating the conditions of a

June 2017 probationary sentence by committing the new offenses of loitering and prowling, obstruction of a law enforcement officer, and interference with government property. At the hearing, the State presented the testimony of three police officers and played about four-and-a-half minutes of video with audio that was recorded by one officer's body camera. That evidence showed the following. On May 3, 2018, an Athens-Clarke County police officer responded to a "suspicious-person" call in the area of the Oglethorpe Elementary School shortly after students were dismissed at 2:30 p.m. The responding officer drove around the school property in his patrol car, and for a few seconds he saw Glenn walking on the inside of a line of trees and shrubbery that bordered the road behind the school. The officer testified that he radioed to his dispatcher that he was "getting out [of his patrol car] with a subject matching the description given by the initial [911] caller."

The responding officer approached Glenn and called out to him, "let me talk to you real quick." Glenn asked if he was being detained. The officer responded, "yes," ordered Glenn to stop walking and to

sit down, and radioed for backup. Glenn, who remained standing, asked the officer why he was being detained and said, "I'll tell you my name. It's Christopher Glenn. I'm walking home." The officer told Glenn that he was "conducting an investigation" and that, if Glenn moved, he would be charged with obstruction and, if he tried to flee, the officer would "use force" if he had to.

About one minute after the responding officer's initial contact with Glenn, another officer arrived. Each officer grasped one of Glenn's wrists, and they began to apply handcuffs.[2] Two more officers arrived in a third patrol car and ran to join the others, followed soon thereafter by another officer in a fourth car. Glenn was handcuffed within two minutes of the responding officer's initial contact with him. While the first responding officer gripped Glenn's wrist and arm, the other officers searched his person and removed

---

[2] At the revocation hearing, the responding officer testified that, when he and the second officer handcuffed Glenn, they were arresting him for loitering and prowling, although there is no evidence that any officer said so to Glenn, and for "potential other charges" for which "the incident was still under investigation." He admitted that he and the other officers had not yet developed probable cause for any offense other than loitering and prowling. The second officer did not testify at the hearing.

and inspected the contents of his pockets. After the search, the second officer told Glenn he was going to have to take a seat in his patrol car. Glenn said, "I want you to tell me right here, what am I being detained for?" The third officer told him, "for suspicion of a crime. A sexual assault crime against a minor."[3] The responding officer testified that, after Glenn had been detained and there were enough officers to maintain control, he left that location to continue his investigation of the suspicious-person complaint at the school.[4]

The third officer testified that Glenn was placed in the second officer's patrol car, and within a few minutes the second officer asked for an ambulance to evaluate Glenn, who had told him that he was dehydrated. An ambulance arrived, and Glenn was placed in the treatment area of the ambulance. The supervising officer soon

---

[3] No other information about any alleged sexual assault complaint was put before the trial court.

[4] The transcript of the probation revocation hearing reflects that the trial court reviewed only the first four minutes, thirty-four seconds of the video, which was almost forty-four minutes long. At that point, Glenn had been handcuffed and walked to the patrol car of the officer who was second on the scene, and the responding officer walked away, toward his patrol car. The video did not capture Glenn's resistance to being placed and detained in the patrol car.

ordered that Glenn be removed from the ambulance, because Glenn was in custody and his condition would be assessed by jail personnel. Instead of exiting, Glenn grabbed onto a seatbelt, and the officers had to physically drag him to the rear doors of the ambulance. At the doors, Glenn flung himself toward the officers and hit the supervising officer's head with his own forehead, causing a small abrasion on the officer's cheek.

The third officer testified that Glenn became "dead weight and resistant" as officers took him to a patrol car and tried to put him in through the rear driver side door. An officer reached in from the passenger side and pulled Glenn into the car. Glenn kicked against the driver side door and fell out on the passenger side, landing on the officer who had pulled him in and knocking the officer down. The officers then tried to put Glenn back in on the passenger side, and again another officer had to pull him in from the other side of the car. Glenn kicked against the passenger side door hard enough to damage the hinges and to propel himself out of the car. He stood up on the driver side, and the supervising officer knocked him to the

ground. Officers put Glenn in the patrol car for the third time. After the officers tied his legs and secured his feet to the floor, Glenn was taken to the jail.

The day after Glenn was arrested, a probation officer requested, and the trial court issued, a warrant to arrest Glenn for violating the conditions of his probation by committing the new offenses of loitering and prowling,[5] obstruction of a law enforcement officer,[6] and interference with government property.[7] Two weeks later, the State filed a petition to revoke Glenn's probation, listing the same offenses as violations of his probation.

After presentation of evidence at the hearing on the revocation petition, the State argued that the evidence showed that Glenn

---

[5] See OCGA § 16-11-36 (a) ("A person commits the offense of loitering or prowling when he is in a place at a time or in a manner not usual for law-abiding individuals under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity.").

[6] See OCGA § 16-10-24 (a) ("Except as otherwise provided in subsection (b) of this Code section, a person who knowingly and willfully obstructs or hinders any law enforcement officer . . . in the lawful discharge of his or her official duties shall be guilty of a misdemeanor.").

[7] See OCGA § 16-7-24 (a) ("A person commits the offense of interference with government property when he destroys, damages, or defaces government property[.]").

committed the offense of loitering and prowling by "walking along the wooded edge of an elementary school as the school was being let out." The State argued that Glenn committed the offenses of obstruction and interference with government property by "physically resisting in multiple ways at multiple points in time" while being "detained . . . pending further investigation of the reason for [the officers'] dispatch[,] . . . resulting in property damage that rendered a police squad vehicle unable to close properly." In addition, the State argued that, even if the arrest was unlawful such that Glenn did not commit the offense of obstruction, the unlawfulness of the arrest would not excuse his behavior in damaging government property.

Glenn argued that the evidence instead showed that the responding officer lacked probable cause to arrest him for loitering and prowling, which made the arrest unlawful. He argued that under Georgia law a person is allowed to resist an unlawful arrest with a reasonable amount of force and that it does not matter whether the force used to get away from an illegal detention is

directed against an officer or against an object.

The trial court determined that the evidence did not support a finding by a preponderance of the evidence that Glenn had committed the offense of loitering and prowling. Specifically, the trial court found that, on May 3, 2018, the officers did not observe Glenn in a place at a time or in a manner not usual for law-abiding individuals and found that there was no evidence of any circumstances of the type listed in the applicable statute as warranting alarm for the safety of persons or property in the vicinity.[8] The trial court noted that the officers involved failed to give

---

[8] OCGA § 16-11-36 (b) provides:

Among the circumstances which may be considered in determining whether alarm is warranted is the fact that the person takes flight upon the appearance of a law enforcement officer, refuses to identify himself, or manifestly endeavors to conceal himself or any object. Unless flight by the person or other circumstances make it impracticable, a law enforcement officer shall, prior to any arrest for an offense under this Code section, afford the person an opportunity to dispel any alarm or immediate concern which would otherwise be warranted by requesting the person to identify himself and explain his presence and conduct. No person shall be convicted of an offense under this Code section if the law enforcement officer failed to comply with the foregoing procedure or if it appears at trial that the explanation given by the person was true and would have dispelled the alarm or immediate concern.

Glenn, prior to arresting him, an opportunity to explain his presence and conduct so as to dispel any alarm or immediate concern which would otherwise be warranted.[9] The trial court also determined that the evidence did not support a finding by a preponderance of the evidence that Glenn had committed the offense of obstruction, because there had been no basis to arrest Glenn for loitering and prowling.

But the trial court found by a preponderance of the evidence that Glenn had committed the felony offense of interference with government property by damaging the patrol car door. Specifically,

---

[9] In *Bell v. State*, 252 Ga. 267 (313 SE2d 678) (1984), this Court considered a facial challenge to the constitutionality of OCGA § 16-11-36. We concluded that the statute, in authorizing conviction for conduct "not usual for law abiding individuals" that creates "a reasonable alarm or immediate concern for the safety of persons or property in the vicinity," defines the offense in terms which discourage arbitrary enforcement. Id. at 271 (1) (punctuation omitted). We noted that subsection (b) offers "useful guidelines" to assist an officer in making the required determination. Id. We pointed out that under subsection (b), "no violation [of the Code section] occurs if the investigating officer fails to afford the suspect an opportunity to dispel otherwise reasonable alarm by explaining his conduct." Id. See also *Waldrop v. State*, 300 Ga. App. 281, 285 (3) (684 SE2d 417) (2009) ("There is some evidence of loitering when the defendant offers an inadequate explanation of his presence in a place and at a time not usual for law-abiding individuals.")

the trial court found that, even though Glenn's arrest for loitering and prowling was unlawful, he had no legal justification for damaging government property once he was in handcuffs and sitting in the patrol car. The trial court stated that damaging the car "kind of goes outside the bounds. . . . [Y]ou'd have a right to come [to court] and . . . attack the validity of the arrest or detainment or obstruction charges." The trial court granted the State's petition and revoked Glenn's probation for a period of 90 days.[10]

The Court of Appeals granted Glenn's application for a discretionary appeal and thereafter affirmed the trial court's ruling by a split-panel decision. The majority noted that Glenn's argument was based in part on the right to use force against a police officer to resist an unlawful arrest and also noted that there is a dearth of case law on whether that right extends to the use of force against property to counter an illegal arrest. *Glenn,* 350 Ga. App. at 15. Without resolving this question, the majority held that "given th[e]

---

[10] The trial court suspended the sentence, conditioned on Glenn's acceptance into the treatment and accountability court program.

lapse in time" between when Glenn was placed in the patrol car and when he damaged the vehicle door, which the majority determined based on the responding officer's body camera footage to have been at least 15 minutes,[11] "Glenn's damage to the vehicle was not in response to an *immediate* need to resist an unlawful arrest, but rather was an intentional act occurring some time after he was detained." Id. at 16-17 (emphasis in original), citing *Brower v. State*, 298 Ga. App. 699, 705 (1) (680 SE2d 859) (2009) ("A premise underlying all the defenses specified in OCGA § 16-3-20 is that the defendant faced circumstances created by external events that demanded prompt, if not immediate, action.), disapproved of on other grounds by *McClure v. State*, 306 Ga. 856, 864 (1) n.17 (834 SE2d 96) (2019).

Then-Presiding Judge McFadden dissented, concluding that Glenn did indeed face an "imminent threat" in the form of "immediate and *continuing* unlawful detention." *Glenn*, 350 Ga. App. at 18 (emphasis supplied). The dissent reasoned that "[i]t could

---

[11] See *Glenn*, 350 Ga. App. at 13.

not be seriously argued that kidnapping victims must become compliant once they have been restrained and confined," and, therefore, justification would "obviously preclude[ ]" a charge of criminal damage to property against a kidnapping victim. Id.

1. Glenn contends that the trial court and the Court of Appeals misconstrued Georgia law regarding the common-law right to resist an unlawful arrest or detention. Specifically, Glenn argues that in Georgia a person has a common-law right to resist an unlawful arrest or detention with the degree of force necessary to achieve that purpose; that such resistance may include damaging government property in order to escape from an illegal detention; and that a detention following an unlawful arrest continues to be unlawful until such time as lawful process issues.

The Georgia General Assembly adopted the common law of England as of May 14, 1776, as Georgia's own law, except to the extent that Georgia's statutory or constitutional law displaced the common law, and that adoption remains in force today. See OCGA §

1-1-10 (c) (1);[12] *Barrow v. Raffensperger*, 308 Ga. 660, 682 (4) (b) (842 SE2d 884) (2020); *Lathrop v. Deal*, 301 Ga. 408, 411-412 (II) (A), n.9 (801 SE2d 867) (2017). As explained below, with the adoption of the common law, including the law of arrests, Georgia incorporated an affirmative right that was imbedded by 1776 in the common law of England to physically resist an unlawful arrest or escape from an unlawful detention.[13]

(a) *The common law of arrests.*

Personal liberty and corresponding limitations on the power to arrest were fundamental to the Magna Carta.[14] Common-law

---

[12] OCGA § 1-1-10 (c) (1) provides:
   The following specific laws and parts of laws are not repealed by the adoption of this Code and shall remain of full force and effect, pursuant to their terms, until otherwise repealed, amended, superseded, or declared invalid or unconstitutional: . . . [a]n Act for reviving and enforcing certain laws therein mentioned and adopting the common laws of England as they existed on May 14, 1776, approved February 25, 1784. (For the adopting Act of 1784, see Prince's 1822 Digest, p. 570; Cobb's 1851 Digest, p. 721; and Code of 1863, Section 1, paragraph 6.)

[13] See 44 ALR3d 1078 (1972) ("The English common-law right to resist an unlawful arrest became established at least by 1710, and during the nineteenth and early twentieth centuries, it became the established rule in the United States as well." (citation omitted)).

[14] "No freeman shall be taken or imprisoned or disseised or exiled or in any way destroyed, nor will we go upon him nor send upon him, except by the

criminal procedure was largely accusatory, rather than investigatory, in nature, and criminal proceedings were generally initiated by crime victims who went before a magistrate to obtain an arrest warrant. See Thomas Y. Davies, The Supreme Court Giveth and the Supreme Court Taketh Away: The Century of Fourth Amendment "Search and Seizure" Doctrine, 100 J. Crim. L. & Criminology 933, 943 (2010). A complainant would appear before a judicial officer authorized to administer an oath, ordinarily a justice of the peace, swear under oath based on personal knowledge that a crime had been committed, and provide evidence showing that a

---

lawful judgement of his peers or by the law of the land." Magna Carta § 39 (1215); see also 1 William Blackstone, Commentaries on the Laws of England, p. 130 (1765) ("[T]he law of England regards, asserts, and preserves the personal liberty of individuals. This personal liberty consists in the power of loco-motion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint, unless by due course of law."). The common-law definition of an arrest, as enunciated by Blackstone, was "the apprehending or restraining of one's person, in order to be forthcoming to answer an alleged or suspected crime." 4 William Blackstone, Commentaries on the Laws of England, p. 286 (1769). See also 3 Joel Prentiss Bishop, Criminal Procedure; or, Commentaries of the Law of Pleading and Evidence and the Practice in Criminal Cases, p. 86 § 156 (3rd ed. 1880) ("An arrest is the taking into custody of a person, or a person and his goods, in pursuance of some lawful command or authority.").

certain person was known, or reasonably suspected, to be the offender. See 1 Matthew Hale, Historia Placitorum Coronae: The History of the Pleas of the Crown, pp. 579-580 (1736); 4 William Blackstone, Commentaries on the Laws of England, p. 287 (1769); Davies, supra, 100 J. Crim. L. & Criminology at 943-944 & n.28.[15] After considering the complainant's statement and any other evidence, the magistrate would issue a warrant directing that the offender be arrested and brought in to answer for the charge. See 1 William Blackstone, Commentaries on the Laws of England, pp.

---

[15] See also 1 Francis Wharton, A Treatise on Criminal Procedure, § 24, pp. 46-48 (10th ed. 1918) ("The usual commencement of a criminal procedure is a preliminary oath before a magistrate, upon which, if it appear on the face of such oath that a criminal offense has been committed by the defendant within the magistrate's jurisdiction, a warrant of apprehension issues. The affidavit must be specific, and must aver personal knowledge on the part of the affiant." (footnotes omitted)).

132-133 (1765);[16] 4 Blackstone, supra, pp. 287-288;[17] Davies, supra,

100 J. Crim. L. & Criminology at 943 & n.26. "[W]hen a warrant is

received by the officer, *he is bound to execute it*, so far as the

jurisdiction of the magistrate and himself extends." 4 Blackstone,

---

[16] Blackstone wrote:

> The confinement of a person, in any wise, is an imprisonment. So that . . . arresting or forcibly detaining him in the street, is an imprisonment. . . . To make imprisonment lawful, it must either be by process from the courts of judicature, or by warrant from some legal officer having authority to commit to prison; which warrant must be in writing, under the hand and seal of the magistrate, and express the causes of the commitment, in order to be examined into (if necessary) upon a *habeas corpus*.

1 Blackstone, supra, pp. 132-133.

[17] Blackstone wrote that warrants may be granted by justices of the peace

> in any cases where they have a jurisdiction over the offence; in order to compel the person accused to appear before them. . . . [A] justice of peace hath power to issue a warrant to apprehend a person *accused* of felony, though not yet *indicted*; and . . . also . . . a person *suspected* of felony, though the original suspicion be not in himself, but in the party that prays his warrant; because he is a competent judge of the probability offered to him of such suspicion. But in both cases it is fitting to examine upon oath the party requiring a warrant, as well to ascertain that there *is* a felony or other crime actually committed, without which no warrant should be granted; as also to *prove* the cause and probability of suspecting the party, against whom the warrant is prayed. This warrant . . . should be directed to the constable, or other peace officer, requiring him to bring the party either generally before *any* justice of the peace for the county, or only before the justice who granted it.

4 Blackstone, supra, pp. 287-288 (footnotes omitted; emphasis in original).

supra, p. 288 (emphasis supplied). See also 1 Hale, supra, p. 581 (A warrant issued by a justice of the peace is ordinarily directed to the sheriff or constable, and "they are indictable, and subject thereupon to a fine and imprisonment, if they neglect or refuse it."). Even when arrested pursuant to a warrant, the accused was to be brought to a justice of the peace who, after a hearing, would examine the accused (without oath) and the witnesses (under oath) and either completely discharge the accused, set a reasonable bail for bailable offenses, or hold him in jail pending trial for nonbailable offenses. 1 Hale, supra, pp. 583-585; 4 Blackstone, supra, pp. 293-294.[18]

---

[18] Blackstone wrote:

> When a delinquent is arrested by any of the means [authorized], he ought regularly to be carried before a justice of the peace. . . . The justice, before whom such prisoner is brought, is bound immediately to examine the circumstances of the crime alleged: and to this end by statute . . . he is to take in writing the examination of such prisoner, and the information of those who bring him. . . . If upon this enquiry it manifestly appears, either that no such crime was committed, or that the suspicion entertained of the prisoner was wholly groundless, in such cases only it is lawful totally to discharge him. Otherwise he must either be committed to prison, or give bail; that is, put in securities for his appearance, to answer the charge against him.

4 Blackstone, supra, pp. 293-294.

To protect public safety, warrantless arrests were permitted at common law for felonies,[19] but warrantless arrests for misdemeanors and other petty offenses were only lawful where a peace officer personally witnessed the offense being committed and the misdemeanor amounted to a breach of the peace. See 1 Hale, supra, p. 587 ("A constable may *ex officio* arrest a breaker of the peace in his view, and keep him . . . till he can bring him before a justice of the peace. . . . But if there be only an affray, and not in view of the constable, it hath been held he cannot arrest him without a warrant from the justice[.]"); 4 Blackstone, supra, p. 291 (A constable "may, without a warrant, arrest any one for a breach of the peace, committed in his view, and carry him before a justice of the peace.").[20] Like other arrestees, a person arrested without a warrant

---

[19] See 4 Blackstone, supra, p. 289 ("[I]n case of felony actually committed, or a dangerous wounding whereby felony is like to ensue, he may upon probable suspicion arrest the felon" without a warrant.).

[20] See also *Bad Elk v. United States*, 177 U. S. 529, 534 (20 SCt 729, 44 LE 874) (1900) ("[A]n officer, at common law, was not authorized to make an arrest without a warrant, for a mere misdemeanor not committed in his presence."); *Kurtz v. Moffitt*, 115 U. S. 487, 498-499 (6 SCt 148, 29 LE 458) (1885) ("By the common law of England, neither a civil officer nor a private citizen had the right without a warrant to make an arrest for a crime not

would be taken to the justice of the peace to be discharged, bailed, or jailed. See 4 Blackstone, supra, pp. 293-294. It follows that, after a warrantless arrest, the accused could be lawfully detained after a judicial determination of sufficient grounds for the arrest.[21]

(b) *The common-law right to resist an unlawful arrest or detention.*

The common-law right to forcibly resist an unlawful arrest and detention arises in the context of warrantless arrests. One seminal case, *The Queen v. Tooley*, 92 Eng. Rep. 349 (2 Ld. Raym. 1296) (K. B. 1709),[22] was cited by John Adams in June 1769 in his Argument

---

committed in his presence, except in the case of felony, and then only for the purpose of bringing the offender before a civil magistrate."); 1 Hale, supra, pp. 587-590; 1 Wharton, A Treatise on Criminal Procedure, supra, § 37, pp. 75-76 (In the case of a misdemeanor not committed in a police officer's presence, the officer may not "lawfully apprehend the offender without a warrant. . . . Why, if the misdemeanor is completed, and the offender is not likely to escape, should the check and safeguard of a warrant be waived?")

[21] See *Harris v. City of Atlanta*, 62 Ga. 290, 290-291 (2), (3) (1879) (When a police officer arrests a suspect without a warrant, he should take the suspect "before a magistrate within a reasonable time after such arrest, in order to have the suspicion judicially verified. . . . Whether the detention be for an unreasonable time is a question for the jury under all the facts and circumstances of the case.").

[22] See Paul G. Chevigny, "The Right to Resist an Unlawful Arrest," 78 Yale L.J. 1128, 1129 (I) (1969) ("*The Queen v. Tooley* firmly established the right to resist an unlawful arrest." (citation omitted)).

and Report to the Special Court of Admiralty, Boston.[23] In *Tooley*, a constable arrested without a warrant a woman whom he suspected of being a disorderly person. Three men armed with swords intervened and attempted to liberate the woman, before and again after the constable took her to and confined her in jail. Outside of the jail, one of the armed men fatally wounded a man who was helping to keep the woman in custody and to protect the constable. A jury found, among other facts, that the woman was not behaving in a disorderly manner when the constable arrested her. Based on the jury's findings of fact, the court determined that the constable had no legal authority to arrest the woman and therefore was not executing the duties of his office but was instead acting as "a common oppressor." Id. at 352. The court reasoned that an invasion of the liberty of any person was an offense against the Magna Carta

---

[23] "Adams' Argument and Report: Special Court of Admiralty, Boston, June 1769," Founders Online, National Archives (Original source: The Adams Papers, Legal Papers of John Adams, vol. 2, Cases 31-62, ed. L. Kinvin Wroth and Hiller B. Zobel. Cambridge, MA: Harvard University Press, 1965, pp. 322-335), accessed on August 5, 2020, at https://founders.archives.gov/documents/Adams/05-02-02-0008-0002-0007.

and the laws, in which "all the subjects of England" are concerned. Id. at 352-353. Therefore, the court reasoned, the imprisonment of a person without lawful authority, especially under "a colour of justice," "is a sufficient provocation to all people out of compassion" to use force to rescue a person who is "unlawfully restrained of her liberty." Id. The fact that the fatal blow was struck after the arrest of the woman was complete and she was confined in jail did not lessen the provocation caused by her unlawful detention. "[C]ertainly the putting her in prison," the court reasoned, "and not carrying her before a justice, as they should have done, is an aggravation" of the provocation arising from the illegal arrest. Id. The court ruled that the provocation caused by the woman's unlawful arrest and her continued unlawful detention reduced the offense from murder to manslaughter.[24]

---

[24] See *United States v. Travers*, 28 F. Cas. 204, 207 (Brunn. Coll. C. 467, 2 Wheeler C. C. 490) (C.C.D. Mass. 1814) ("Homicide in resisting an arrest substantially illegal, will, at most, amount only to manslaughter."); see also Francis Wharton, The Law of Homicide § 408, pp. 631-632 (3d ed. 1907) ("If an officer, without lawful authority or just cause, arrests a person, there is an illegal assault which such person has a right at once to resist and prevent; and

As enunciated in *Tooley*, the common-law right to resist an unlawful arrest acted to mitigate the defendant's culpability for murder. However, when the rule was applied in cases where the defendant was charged with crimes other than homicide related to resistance to an arrest, a finding that a person committed an otherwise criminal act in the course of resisting an unlawful arrest served as a complete defense to such criminal charges. See *The King v. Curvan*, 168 Eng. Rep. 1213 (1 Mood. 132) (K. B. 1826) (Where a man told a constable that the defendant insulted him, the constable arrested the defendant without a warrant, and the defendant attempted to escape and cut the face of a man who was helping the constable, the defendant was entitled to an acquittal on a charge of obstruction because the arrest was illegal.); *The King v. Thompson*, 168 Eng. Rep. 1193 (1 Mood. 80) (K. B. 1825) (Where a man told a constable that the defendant, his employee, left the man's shop

if the death of the person seeking to make the arrest results from the resistance by lawful measures, it is excusable homicide; and it has been held that, if necessary, rather than submit, he may lawfully kill the person seeking to arrest him." (citing *Coleman v. State*, 121 Ga. 594, 599 (49 SE 716) (1905), and other states' appellate decisions)).

without finishing his work and that the man suspected that the defendant had taken the man's tools, the constable arrested the defendant without a warrant, and the defendant resisted the arrest by stabbing the constable with a knife, the defendant's assault was excused entirely because the arrest was illegal.).

Generally, under the common law, a person cannot be punished for fleeing from or physically resisting an unlawful arrest or escaping from an unlawful detention, so long as the person uses no more force than is necessary to achieve such purpose. See *United States v. Di Re*, 332 U. S. 581, 594 (68 SCt 222, 92 LE 210) (1948) ("One has an undoubted right to resist an unlawful arrest, and courts will uphold the right of resistance in proper cases. . . . If the officer [had] no right to arrest, the other party might resist the illegal attempt to arrest him, using no more force than was absolutely necessary to repel the assault constituting the attempt to arrest."); *Bad Elk v. United States*, 177 U. S. 529, 534-535 (20 SCt 729, 44 LE 874) (1900) (At common law, "[i]f the officer [had] no right to arrest, the other party might resist the illegal attempt to arrest

him, using no more force than was absolutely necessary to repel the assault constituting the attempt to arrest."); *Prichard v. State*, 160 Ga. 527, 529 (128 SE 655) (1925) ("A citizen, by common law, and by [Georgia] law, can resist an illegal arrest, and in resistance of such arrest can use such force as may be necessary to prevent the same."); *Graham v. State*, 143 Ga. 440, 445-446 (3) (85 SE 328) (1915) ("If no more than proper force is used by the person sought to be illegally arrested in resistance thereof, he is guilty of no offense."); *Coleman v. State*, 121 Ga. 594, 599 (49 SE 716) (1905) (An unlawful arrest is an assault that justifies the person "in breaking away, resisting, and repelling force with force[,]" but the force that the person can "thus rightfully use could only be proportionate to that exerted by [the arresting officer], and sufficient to avoid the detention.").[25] "Every

---

[25] See also *Napper v. State*, 200 Ga. 626, 629 (1) (38 SE2d 269) (1946) (When an arrest is not authorized under the law, and, hence, is illegal, "[s]uch an illegal arrest is in law an assault by the arresting officer upon the person arrested. It constitutes legal justification for the employment by the person arrested of force sufficient in amount to avoid an arrest and repel the assault."); *Traylor v. State*, 127 Ga. App. 409, 410 (1) (193 SE2d 876) (1972) (A suspect "had the right to leave, and to ignore or defy [an] arrest [for prowling, allegedly in violation of a city ordinance], if said arrest was illegal."); *Smith v. State*, 84 Ga. App. 79, 82 (1) (65 SE2d 709) (1951) ("[T]he repulsion by proportionate

man . . . has a right to shun an illegal arrest by flight. The exercise of this right should not, and would not, subject him to be arrested as a fugitive." *Thomas v. State*, 91 Ga. 204, 206 (2) (18 SE 305) (1892). An officer cannot

> attempt an illegal arrest . . . and then justify the attempt on the ground that the person sought to be arrested would not stand still until the arrest was made, but ran away to avoid it. To call this endeavoring to escape, and to treat it as legalizing what would otherwise be an illegal arrest, would be going round in a circle.

---

force of an illegal arrest does not constitute a crime."); *Perdue v. State*, 5 Ga. App. 821, 826-827 (63 SE 922) (1909) ("[W]hen an officer of the law . . . abuses his authority and transcends the bounds thereof, the citizen is not required to peacefully submit. The citizen has the right to maintain his liberty at all hazards against any and all persons who attempt to invade it unlawfully, taking care not rashly to use or resort to greater violence than is necessary to its protection." (citation and punctuation omitted)); Wharton, The Law of Homicide, supra, § 409, p. 633 ("The degree of violence which is necessary to resist an illegal arrest, or to regain one's liberty when illegally restrained, depends upon that used or attempted by the person making such arrest." (citing Alabama and Texas appellate decisions)); Chevigny, supra, 78 Yale L.J. at 1137-1138 ("The right to resist unlawful arrest memorializes one of the principal elements in the heritage of the English revolution: the belief that the will to resist arbitrary authority in a reasonable way is valuable and ought not to be suppressed by the criminal law. In the face of obvious injustice, one ought not to be forced to submit and swallow one's sense of justice. More importantly, it is unconscionable to convict a man for resisting an injustice."). But see Craig Hemmens, Resisting Unlawful Arrest in Mississippi: Resisting the Modern Trend, 2 Cal. Crim. L. Rev. 2, 87 (2000) ("There are clear limits on the right [to resist an unlawful arrest]. The rule simply permits the citizen to act at their peril in challenging authority and protects them from punishment for challenging unwarranted authority.").

Id. at 205-206 (2). When an arrest is lawful, of course, the right to resist an unlawful arrest is not pertinent.[26]

Further, a person unlawfully arrested has a common-law right to escape from detention following an unlawful arrest. See Francis Wharton, The Law of Homicide § 411, p. 636 (3d ed. 1907) (Under the common law, "[o]ne who makes an illegal arrest has no right to detain the prisoner, and no authority to prevent his escape." (citing *Curvan*, 168 Eng. Rep. 1213, and Texas appellate decisions); 3 Joel Prentiss Bishop, Criminal Procedure, or, Commentaries on the Law of Pleading and Evidence and the Practice in Criminal Cases, § 162, p. 88 (3rd ed. 1880) (A person "unlawfully arrested is justified in escaping if he can; and an attempt to rearrest him will be equally unlawful with the first arrest." (citations omitted)). And "the fact that no resistance or protest was made to the original arrest does

---

[26] See *Grimes v. Burch*, 223 Ga. 856, 858 (159 SE2d 69) (1968) ("Where one is confined by lawful authority it is his duty to submit until delivered by due process of law."); *Mullis v. State*, 196 Ga. 569, 579 (7) (27 SE2d 91) (1943) (Where an arrest is lawful, the person sought to be arrested has no right to resist with force.); see also 3 Bishop, supra, § 159, p. 87 ("It is the duty of every man to submit himself to a lawful arrest, and a forcible resistance is a crime.").

not make it legal and deprive the person of the right to attempt to regain his liberty." Wharton, The Law of Homicide, supra, § 411, p. 636. See also *Franklin v. Amerson*, 118 Ga. 860, 864 (2) (45 SE 698) (1903) (Even if a suspect "did, at first, agree to go with the [officer] to the police barracks, she had the right to withdraw her consent to do so," where the arrest was unlawful.). Thus, the common-law right to resist an illegal detention continues after an unlawful, warrantless arrest is accomplished. But, as explained above, the right to resist an unlawful arrest or detention is not pertinent to arrests under warrants, and resistance to detention after an arrest warrant is issued or after a judicial determination of sufficient grounds for the arrest would not be grounded in the common-law right to resist an unlawful arrest. See *Grimes v. Burch*, 223 Ga. 856, 858 (159 SE2d 69) (1968).

In the context of the common-law right to resist an unlawful arrest, we have found no controlling authority for distinguishing between conduct that may harm an officer and conduct that may damage government property. When a person uses injurious force

against an officer to resist being arrested, damage to government property, such as the officer's uniform being pierced by a bullet or a blade, the officer's radio being damaged during a struggle with the arrestee, or even the officer's patrol car being damaged, are secondary concerns and less likely to result in separate criminal charges. Notwithstanding the dearth of case law on point, because the common-law right to resist an unlawful arrest or detention is framed in terms of the proportionate use of force necessary to resist the force used to arrest or detain a person, we conclude that the right does not distinguish between the use of force against an arresting officer's person and the use of force against objects, including government property.

(c) *Effect of Georgia's constitutional and statutory law on the common-law right to resist an unlawful arrest or detention.*

Having determined that the common law of England circa May 1776 recognized a right to resist an unlawful arrest or detention, including a right to damage government property if necessary, as explained above, we must also determine whether that common-law

right has been modified or displaced by Georgia's constitutional or statutory law. See *Lathrop*, 301 Ga. at 411-412 (II) (A) & n.9.

First, we have found no authority in the Georgia Constitution that expressly restricts the right to use the proportionate force necessary to resist an unlawful arrest or escape from an unlawful detention. The Georgia Constitution, in identical text to the Fourth Amendment to the United States Constitution, provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures shall not be violated[.]" Ga. Const. of 1983, Art. I, Sec. I, Par. XIII. Thus, an arrest, which is a seizure of one's person, must be reasonable. See *Brown v. State*, 293 Ga. 787, 791 (2) (a) n.6 (750 SE2d 148) (2013) (Paragraph XIII is generally applied in accord with the Fourth Amendment in the context of this guarantee.). This provision of the Georgia Constitution did not displace the common-law right by forbidding, expressly or by necessary implication, the extrajudicial remedy of using proportionate force to resist an unlawful arrest or escape from an unlawful detention.

Nor have we found any statutory authority that places limitations on the common-law right to resist an unlawful arrest or escape from an unlawful detention. The offense at issue in this case, interference with government property, was enacted in 1968. See Ga. L. 1968, p. 1317, § 1 (now codified as OCGA § 16-7-24 (a)). The common-law right to resist an unlawful arrest or detention was a longstanding part of Georgia law by then, and the Code section does not expressly provide that it shall be no defense that the destruction, damage, or defacement of government property was incidental to the defendant's exercise of the common-law right to resist an unlawful arrest or detention. Consequently, we see no basis for concluding that the Code section displaced the common-law right.[27]

The Georgia statute that is perhaps most pertinent to the right to resist arrest is OCGA § 16-10-24, defining the offense of

---

[27] See *Undisclosed LLC v. State*, 302 Ga. 418, 421 (2) (a) (807 SE2d 393) (2017) ("[A]lthough the common law may be amended [by statute], such changes must be clear."); *Grange Mut. Cas. Co. v. Woodard*, 300 Ga. 848, 854 (2) (b) (797 SE2d 814) (2017) (where plain language of statute did not expressly or by necessary implication contravene common law principles, court could not conclude that the statute displaced those common law principles).

obstruction. By its express terms, OCGA § 16-10-24 applies only when the defendant obstructs or hinders a law enforcement officer *"in the lawful discharge of his or her official duties."* (emphasis supplied). It is well settled that detaining or arresting a person without authority to do so under the law does not constitute the lawful discharge of the duties of a law enforcement officer, and, therefore, one who resists an unlawful arrest or detention does not commit the offense of obstruction. See *Bacon v. State*, 347 Ga. App. 689, 690 (820 SE2d 503) (2018) ("A police officer is not discharging his lawful duties when he is making an unlawful arrest, and a person who resists an unlawful arrest does not hinder the officer in the lawful discharge of his official duties. A person has the right to resist an unlawful arrest." (citations and punctuation omitted)).[28] It

---

[28] See, e.g., *Ewumi v. State*, 315 Ga. App. 656, 664-665 (2) (a) (727 SE2d 257) (2012) *(*Where an officer attempted an unlawful arrest and the defendant struggled against the officer and allegedly struck the officer with his elbows, the defendant was justified in resisting the attempted arrest with all force that was reasonably necessary to do so, and the defendant's attempt to resist that arrest could not form the basis of a conviction for obstruction because the officer was not engaged in the lawful discharge of official duties.); *Woodward v. State*, 219 Ga. App. 329, 330-331 (1) (465 SE2d 511) (1995) (Where there was no evidence that a visitor to the sheriff's office committed the misdemeanor

follows that OCGA § 16-10-24 did not displace the common-law right to resist an unlawful arrest.

Similarly, under Georgia criminal law, a person commits the offense of escaping from custody or confinement, prior to conviction only if the escape is from "*lawful* custody or . . . *lawful* confinement[.]" OCGA § 16-10-52 (a) (emphasis supplied).[29] This

offenses of criminal trespass or disorderly conduct in an officer's presence, her arrest was not authorized and the officer was not in the lawful discharge of his duties when he arrested the defendant. Because there was no evidence showing that the defendant's arrest was lawful, she "had the right to resist with all force necessary for that purpose" and her conviction for the offense of obstruction of a law enforcement officer was not authorized by the evidence. (citation and punctuation omitted)); see also *Long v. State*, 261 Ga. App. 478, 479-480 (1) (583 SE2d 158) (2003) ("[A]n argument that the arrest was unlawful does not state an affirmative defense to a charge of obstruction. Rather, that argument is an assertion that the state has failed to prove an essential element of the offense — a lawful arrest.").

[29] OCGA § 16-10-52 (a) provides:

A person commits the offense of escape when he or she:

(1) Having been convicted of a felony or misdemeanor or of the violation of a municipal ordinance, intentionally escapes from lawful custody or from any place of lawful confinement;

(2) Being in lawful custody or lawful confinement prior to conviction, intentionally escapes from such custody or confinement;

(3) Having been adjudicated of a delinquent act or a juvenile traffic offense, or as a child in need of services subject to lawful custody or lawful confinement, intentionally escapes from lawful custody or from any place of lawful confinement;

(4) Being in lawful custody or lawful confinement prior to adjudication, intentionally escapes from such custody or

Code section, therefore, does not affect the common-law right to resist an unlawful detention by fleeing or escaping.

Another criminal offense relevant to detentions and arrests is OCGA § 16-5-41 (a), which provides: "A person commits the offense of false imprisonment when, in violation of the personal liberty of another, he arrests, confines, or detains such person *without legal authority*." (Emphasis supplied.) See *Holliday v. Coleman*, 12 Ga. App. 779, 780 (78 SE 482) (1913) (citing the predecessor provision in Penal Code of 1910, § 106). A law enforcement officer who detains or arrests a person without legal authority may be guilty of the offense of false imprisonment. See *Stone v. Nat. Surety Corp.*, 57 Ga. App.

---

confinement; or
> (5) Intentionally fails to return as instructed to lawful custody or lawful confinement or to any residential facility operated by the Georgia Department of Corrections after having been released on the condition that he or she will so return; provided, however, such person shall be allowed a grace period of eight hours from the exact time specified for return if such person can prove he or she did not intentionally fail to return.

See also OCGA § 16-10-53 ("A person who knowingly aids another in escaping from lawful custody or from any place of lawful confinement shall, upon conviction thereof, be punished by imprisonment for not less than one nor more than five years.").

427, 429-431 (2) (195 SE 905) (1938).[30] A victim of false imprisonment has the right to defend against the violation of his or her personal liberty. OCGA § 16-5-41 (a), therefore, did not displace the common-law right to resist an unlawful detention or arrest. The Georgia General Assembly also recognized false imprisonment as a tort, which subjects the tortfeasor to liability for the victim's damages. See OCGA § 51-7-20 ("False imprisonment is the *unlawful* detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty." (emphasis supplied.));[31] see also *Holliday*, 12 Ga. App. at 780 (citing the predecessor statute in Civil Code of 1910, § 4447). Like the criminal offense, the tort of false imprisonment is framed in terms of an unlawful detention.[32] See *Williams v. Smith*, 179 Ga. App. 712, 713-

---

[30] See also Robert E. Cleary, Jr., Kurtz Criminal Offenses and Defenses in Georgia, False Imprisonment Crimes (2020 ed.).

[31] See also OCGA §§ 51-7-60 (detentions by store owners and operators of persons suspected of shoplifting); 51-7-61 (same); 51-7-62 (detentions by movie theater owners and operators of persons suspected of film piracy).

[32] See generally Hemmens, supra, 2 Cal. Crim. L. Rev. at 86 ("An unlawful arrest is a form of and the tort of false imprisonment: unwanted touching, deprivation of liberty. The seizure of a person by an officer without legal justification is a serious affront to personal liberty and the right of privacy.").

714 (2) (348 SE2d 50) (1986) (An action to recover damages for false imprisonment requires proof of a detention "and the unlawfulness thereof" — in the case of an arrest without process, that the warrantless detention was not "legally authorized under the circumstances." (citation and punctuation omitted)). But it is a defense to a civil claim for false imprisonment that the detention "is by virtue of a warrant" that is procured, issued, or executed by the defendant in good faith, which "must be determined from the circumstances." OCGA § 51-7-21.[33] In the case of an unlawful, warrantless arrest, as in this case, OCGA §§ 51-7-20 and 51-7-21 are also consistent with the common-law right to resist.

Although the right to resist an unlawful arrest or detention is often considered a form of justification, Georgia's justification

---

[33] OCGA § 51-7-21 provides in full:

> If imprisonment is by virtue of a warrant, neither the party who procured the warrant in good faith nor the officer who executed the warrant in good faith shall be liable for false imprisonment even if the warrant is defective in form or is void for lack of jurisdiction. In such cases, good faith must be determined from the circumstances. A judicial officer issuing a warrant in good faith shall not be liable for false imprisonment, provided that, when he has no jurisdiction, there shall be a presumption against such officer's good faith.

statutes, set out in Title 16, Chapter 3, Article 2, also do not supplant the common-law rule. Generally, "[t]he fact that a person's conduct is justified is a defense to prosecution for any crime based on that conduct." OCGA § 16-3-20. A person can claim the defense of justification, for example, against a charge based on acts performed in the course of making an arrest, but only in the case of a *lawful* arrest. See OCGA § 16-3-20 (4) (The defense of justification can be claimed "[w]hen the person's conduct is reasonable and is performed in the course of making a lawful arrest[.]"). In its several sections, Article 2 provides that the defense of justification can be claimed to protect a broad range of interests, such as protecting one's self or others from bodily harm, see OCGA § 16-3-21; repelling another's unlawful intrusion into a habitation, see OCGA § 16-3-23; avoiding criminal liability for conduct wrongfully induced by a government officer or employee, see OCGA § 16-3-25; fulfilling one's duties as a government officer or employee, see OCGA § 16-3-20 (2); and exercising the right to reasonably discipline one's child, see OCGA § 16-3-20 (3). The catchall provision in OCGA § 16-3-20 (6), which

provides that the defense of justification can be claimed "[i]n all other instances which stand upon the same footing of reason and justice as those enumerated in" Article 2, shows that the specific provisions are not exclusive. To the extent a statutory defense of justification is at issue in this case, it is not self-defense under OCGA § 16-3-21 (a),[34] but an unenumerated defense under the catchall provision. See *Glenn*, 350 Ga. App. at 16 ("The issue for this Court is whether the defense of justification under the catchall section of OCGA § 16-3-20 (6) is authorized by the evidence in this case.").[35] Although the Code provides little guidance regarding when

---

[34] See *Hack v. State*, 168 Ga. App. 927 (311 SE2d 211) (1983), which was cited by the Court of Appeals majority in this case. *Glenn*, 350 Ga. App. at 16. In *Hack*, an arrestee damaged two patrol cars and was charged with two counts of criminal damage to property. The Court of Appeals noted that the arrestee's argument on appeal was "that he was illegally arrested, that he had the right to resist and, *as this resistance was self-defense*, the trial court erred in failing to give his requested charges on these issues." *Hack*, 168 Ga. App. 929-930 (6) (emphasis supplied). Given this framing, the Court of Appeals did not address the common-law right to resist arrest but held that the arrestee "was not resisting arrest" when he damaged the patrol cars, as he claimed, because the statutory defense of justification in defense of self, OCGA § 16-3-21 (a), expressly provides a defense only for using force against another person. *Hack*, therefore, provides no guidance on the application of the common-law right to resist an unlawful arrest, particularly when the resistance results in charges relating to property damage.

[35] See *Dugger v. State*, 297 Ga. 120, 126 (9) (c) (772 SE2d 695) (2015) (A

a defense stands upon the same footing of reason and justice as those enumerated in Article 2, in light of the broad range of interests protected in the enumerated justification defenses, we conclude that a jury could find that repelling an unlawful invasion of one's liberty with proportionate force causing damage to property does stand on such footing. See *Tarvestad v. State*, 261 Ga. 605, 606 (409 SE2d 513) (1991) (A jury could have found that the defendant's decision to drive without a license in order to seek medical help for his wife and their soon-to-be-born child stands on the same footing of reason and justice as the enumerated justification defenses, and the defendant

---

jury instruction based on OCGA § 16-3-20 (6) "is appropriate only if the defendant's conduct is not encompassed by one of the specifically enumerated circumstances for claiming a defense of justification, but still might be justified because it stands upon the same footing of reason and justice as those enumerated" in Article 2, and therefore a jury instruction covering the catchall provision was not warranted where the defendant claimed self-defense. (citation and punctuation omitted)); *Allen v. State*, 296 Ga. 785, 792 (9) (770 SE2d 824) (2015) (A jury instruction on justification under OCGA § 16-3-20 (6) was not warranted where there was no evidence that a person threatening the defendant's family was in a position to harm his family when the defendant killed the victim at that person's insistence and therefore his claim of justification did not stand on the same footing of reason and justice as enumerated defenses that contemplate the use of force in the face of a current or imminent threat.).

was therefore entitled to his requested jury instruction on the defense of justification under OCGA § 16-3-20 (6).).[36] Consequently, we see no basis for concluding that any Code section in Article 2 displaced the common-law right.

Although many states have limited or eliminated the common-law right to resist an unlawful arrest or detention,[37] after reviewing

---

[36] Under different circumstances, the Court of Appeals has found a justification defense under the catchall provision for the charge at issue in this case, interference with government property, based on damage to a patrol car by a detainee. See *Moore v. State*, 234 Ga. App. 332, 333 (1) (506 SE2d 685) (1998). The Court of Appeals held that the defendant was entitled to a jury instruction on justification under the catchall provision because some evidence supported his claim that he tried to kick out a window when he was confined inside the patrol car because he was in respiratory distress resulting from an allergic reaction to pepper spray and needed air. Id.

[37] Section 5 of the Uniform Arrest Act (1941), "Resisting Arrest," provides:

> If a person has reasonable ground to believe that he is being arrested by a peace officer, it is his duty to refrain from using force or any weapon in resisting arrest regardless of whether or not there is a legal basis for the arrest.

A version of Section 5 is in effect in at least eight states. See Ala. Code § 13A-3-28; Cal. Penal Code § 834a; Iowa Code Ann. § 804.12; Kan. Stat. Ann. § 21-5229; Mont. Code Ann. § 45-3-108; N.H. Rev. Stat. Ann. § 594:5; N.Y. Penal Law § 35.27; Or. Rev. Stat. Ann. § 161.260.

At least 13 states have made it at least a misdemeanor to use force in resisting an arrest by a peace officer without limitation to resisting lawful arrests, although some require that the arrest be under color of the officer's official authority, or words to that effect. See Ak. Stat. § 11.56.700; Ark. Code Ann. § 5-54-103 (a); Colo. Rev. Stat. Ann. § 18-8-103 (1) (a); Del. Code Ann. Tit. 11, § 1257 (b); Ky. Rev. Stat. Ann. § 520.090 (1); Haw. Rev. Stat. Ann. § 710-

this State's constitutional and statutory provisions relevant to detentions and arrests, we conclude that the Georgia General Assembly has not done so and that the common-law rule remains in effect in Georgia, at least with respect to charges of obstruction or

---

1026 (1); Mass. Gen. Laws Ann. Ch. 268, § 32B; Mo. Ann. Stat. § 575.150; Neb. Rev. Stat. Ann. § 28-904; N.J. Stat. Ann. § 2C:29-2; N.M. Stat. Ann. § 30-22-1 (B); R.I. Gen. Laws Ann. § 12-7-10 (a); S.D. Codified Laws §§ 22-11-4; 22-11-5.

     Section 3.04 (2) (a) (i) of the Model Penal Code (1961) provides that a use of force is not justifiable under the section, which provides that the use of force in self-protection is justifiable, "to resist an arrest that the actor knows is being made by a peace officer, although the arrest is unlawful[.]" A version of § 3.04 (2) (a) (i) is in effect in at least 13 states. See Az. Rev. Stat. Ann. § 13-404 (b) (2); Ark. Code Ann. § 5-2-612 (1); Conn. Gen. Stat. Ann. § 53a-23; Del. Code Ann. Tit. 11, § 464 (d); Fla. Stat. Ann. § 776.051 (1); 720 Ill. Comp. Stat. Ann. § 5/7-7; Me. Rev. Stat. Ann. Tit. 17-A, § 108 (1-A); Mont. Code Ann. § 45-3-108; Neb. Rev. Stat. Ann. § 28-1409 (2); N.C. Gen. Stat. Ann. § 15A-401 (f); N.D. Cent. Code Ann. § 12.1-05-03 (1); 18 Pa. Stat. Ann. § 505 (b) (1) (i); S.D. Codified Laws § 22-11-5. See also Tex. Penal Code Ann. §§ 9.31 (c) ("The use of force to resist an arrest or search is justified: (1) if, before the actor offers any resistance, the peace officer . . . uses or attempts to use greater force than necessary to make the arrest or search; and (2) when and to the degree the actor reasonably believes the force is immediately necessary to protect himself against the peace officer's . . . use or attempted use of greater force than necessary."); 38.03 (b) ("It is no defense to prosecution [for obstruction of a law enforcement officer] that the arrest or search was unlawful."); Craig Hemmens & Daniel Levin, "Not a Law at All": A Call for a Return to the Common Law Right to Resist Unlawful Arrest, 29 Sw. U. L. Rev. 1, 45-46 (1999) (The "fundamental interest in personal liberty is not recognized by the modern trend abrogating the right to resist unlawful arrest. Instead of continuing the common law tradition of favoring individual rights over state authority, contemporary law favors the statist values of order, process, and power, with little regard for whether such power is exercised lawfully.").

interference with government property.[38] And we conclude that the mere passage of time between an unlawful arrest and an attempt to escape from the ensuing detention has no bearing on whether the use of force was proportionate or necessary. Under Georgia law, therefore, a person may damage government property in an attempt to resist an unlawful, warrantless arrest or escape an unlawful, warrantless detention, using no more than proportionate force, even where, as in this case, officers handcuff an arrestee and place him in a patrol car before the arrestee's property-damaging conduct.

2. Glenn contends that he did not commit the felony offense of interference with government property because he damaged the patrol car only in the course of resisting the officers' use of force to unlawfully detain him and used no more than proportionate force and, therefore, that the Court of Appeals erred in affirming the

---

[38] We note that the Council of Superior Court Judges continues to include a jury instruction on the right in the pattern jury instructions the Council publishes, as follows: "One upon whom an illegal or unlawful arrest is being made has the right to resist the arrest with such force as is reasonably necessary to prevent the arrest." Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 3.16.41 (4th ed. 2020).

revocation of his probation.

> [The appellate court] will not interfere with a [probation] revocation unless there has been a manifest abuse of discretion on the part of the trial court. In terms of the sufficiency of the evidence, [the appellate court] will affirm the judgment of revocation if the record includes some competent evidence to show that the defendant violated the terms of his probation in the specific manner charged, notice of which must be provided in writing before the probation revocation hearing. However, [the appellate court reviews] questions of law de novo.

*Caldwell v. State*, 327 Ga. App. 471, 472 (758 SE2d 325) (2014) (citations and punctuation omitted).

Convictions for interference with government property where the defendant damaged a patrol car in the course of resisting an arrest have been affirmed on appeal in cases also affirming convictions of obstruction based on the same conduct.[39] The holding that a conviction of obstruction was warranted in those cases means that the arrest in each case was lawful, so the property-damaging conduct by definition was not in the exercise of the right to resist an

---

[39] See *Helton v. State*, 284 Ga. App. 777, 779 (1) (644 SE2d 896) (2007); *Meeker v. State*, 282 Ga. App. 77, 79 (1) (637 SE2d 806) (2006); *Granville v. State*, 281 Ga. App. 465, 466 (1) (636 SE2d 173) (2006); *Weldon v. State*, 262 Ga. App. 854, 855 (1) (586 SE2d 741) (2003).

unlawful arrest. These cases therefore do not support a conviction for interference with government property in the course of resistance to an unlawful arrest.

As recounted above, the trial court ruled that the State failed to establish by a preponderance of the evidence that Glenn's warrantless arrest for loitering and prowling was in the lawful discharge of the officers' official duties. The State did not seek review of the trial court's ruling that Glenn's warrantless arrest for loitering and prowling was unlawful. Thus, we take that determination as a given and express no opinion whether that determination was correct. Because the officers were not in the lawful discharge of their duties when they handcuffed Glenn and forced him into the patrol car, he did not commit the offense of obstruction. Despite ruling that Glenn's arrest was unlawful, the trial court determined that Glenn committed the offense of interference with government property, reasoning that he damaged the patrol car "outside the bounds" of the period when he had any right to forcibly resist the arrest. That is, the trial court concluded

that, once Glenn was handcuffed and confined in a patrol car, he was obligated to submit to the detention and wait until he could contest the validity of the arrest and detention in court.

After reviewing our State's constitutional and statutory provisions relevant to detentions and arrests, we concluded in Division 1, supra, that the common-law right to resist an unlawful arrest or detention remains in effect in Georgia. Under the common-law rule, Glenn's right to resist an unlawful detention did not evaporate simply because he kicked the car door "some time" after he was initially handcuffed and seated in a patrol car but before he was brought before a judicial officer or an arrest warrant was issued.[40] Thus, the trial court cut short its analysis when it failed to consider whether Glenn used force to resist the officers' actions that

---

[40] In holding that "Glenn's damage to the vehicle was not in response to an *immediate* need to resist an unlawful arrest, but rather was an intentional act occurring some time after he was detained," *Glenn*, 350 Ga. App. at 16-17 (emphasis in original) the Court of Appeals majority cited *Hack*, 168 Ga. App. at 930 (6) ("Here the defendant was not using force against another person and his resistance did not occur until some time after his alleged unlawful arrest."). As explained in footnote 34, supra, however, the court's holding in *Hack* was limited to resistance in self-defense under OCGA § 16-3-21 (a), as distinct from the common-law right to resist an illegal arrest or detention.

was proportionate under the circumstances. This determination is not for this Court, or for the Court of Appeals, to make in the first instance.[41] Accordingly, the judgment of the Court of Appeals is reversed, and the Court of Appeals is directed on remand to vacate the order revoking Glenn's probation and to remand this case to the trial court for further proceedings consistent with this opinion.

*Judgment reversed, and case remanded with direction. All the Justices concur, except Warren, J., not participating.*

Decided October 5, 2020.

Certiorari to the Court of Appeals of Georgia — 350 Ga. App. 12.

*Benjamin A. Pearlman*, for appellant.

*Kenneth W. Mauldin, District Attorney, Brian V. Patterson, Assistant District Attorney*, for appellee.

---

[41] See *Yates v. State*, 127 Ga. 813, 816 (3) (56 SE 1017) (1907) (evidence presented a jury question whether the defendant shot a marshal who was trying to arrest him in a spirit of malice toward the marshal or whether he shot the marshal simply to prevent the marshal from unlawfully arresting him or in self-defense); see also *Walker v. State*, 46 Ga. App. 824, 827 (169 SE 315) (1933) ("Whether or not the defendant shot in order to protect himself against the illegal arrest that was about to be perpetrated upon him was, in our opinion, a jury question."); *Jenkins v. State*, 3 Ga. App. 146 (59 SE 435) (1907) (syllabus of the court) (Whether a person whose rights are invaded by an unlawful arrest "is guilty of any offense depends upon the facts of the particular case. If the force of resistance is not in excess of the force of invasion, and is used solely for the purpose of prevention, no offense is committed.").